638 P.2d 705

**Julia Barrett JOHNSON, Appellant,**

v.

**Emery Peter JOHNSON, Appellee.**

**No. 15298–PR.**

Supreme Court of Arizona,
En Banc.

Dec. 14, 1981.

Slutes, Browning, Zlaket & Sakrison, P. C. by James M. Sakrison, Tucson, for appellant.

J. Emery Barker, Tucson, for appellee.

HOLOHAN, Vice Chief Justice.

Appellant, Julia Johnson, filed an appeal from the judgment of the superior court in a dissolution proceeding. The court of appeals modified the judgment. *Johnson v. Johnson*, 131 Ariz. 47, 638 P.2d 714 (1980). Both appellant and appellee, Emery Johnson, filed petitions for review. We granted review. The opinion of the court of appeals is vacated.

The principal issue in this case is the proper method to be used in determining the wife's interest in the husband's retirement plan. During the 15-year marriage of the parties, the husband accumulated vested rights in both a profit sharing plan and a pension plan through his employment with a Tucson law firm. At the time of trial, there was $17,047.14 in the profit sharing plan and $55,380.77 in the pension trust, for a total of $72,427.91. The distribution of the funds under both plans lies within the discretion of an administrative committee. Although the committee has discretion to order early distribution of these funds, in the normal course of events the funds would not become available to the husband until he reaches retirement age, at least fifteen years from now [1]. Because the husband had no right to immediate payment, the trial court discounted the value of the funds at 6% interest for 22 years (the amount of time between the date of the divorce decree and the date when the husband would reach age 65).

### VALUATION OF THE WIFE'S COMMUNITY INTEREST IN THE RETIREMENT PLANS

The pension and profit sharing accounts in this case constitute an apprecia-

---

[1]. The terms of the plan provide that participating employees shall retire at age 65 and may retire early after reaching age 60. According to the record, the husband was 42 years old when the petition for dissolution was filed in October, 1978, which now makes him 45. He will reach age 60 in 1996, 15 years from now.

ble portion of the marital estate. Indeed, it is now commonly recognized that pension rights are one of the most valuable of marital assets upon divorce. *In re Marriage of Brown*, 15 Cal.3d 838, 847, 544 P.2d 561, 566, 126 Cal.Rptr. 633, 638, 94 A.L.R.3d at 164, 171 (1976); *see also* DiFranza and Parkyn, *Dividing Pensions on Marital Dissolution*, 55 Calif. S.B.J. 464 (1980) [hereinafter cited as DiFranza] and Hardie, *Pay Now or Later: Alternatives in the Disposition of Retirement Benefits on Divorce*, 53 Calif. S.B.J. 106 (1978) [hereinafter cited as Hardie]. These pension rights are generally viewed as a form of deferred compensation for services rendered by employees. *Brown, supra*, 15 Cal.3d at 845, 544 P.2d at 565, 126 Cal.Rptr. at 637, 94 A.L.R.3d at 169; *Van Loan v. Van Loan*, 116 Ariz. 272, 273, 569 P.2d 214, 215 (1977). As such, it is well settled in Arizona and elsewhere that pension rights, whether vested[2] or non-vested[3], are community property insofar as the rights were acquired during marriage, and are subject to equitable division upon divorce. *See generally*, Annot., 94 A.L.R.3d 176 (1979). As we have previously stated:

"[A]n employee, and thereby the community, does indeed acquire a property right in unvested pension benefits.... Thus, to the extent that such a property right is earned through community effort, it is properly divisible by the court upon dissolution of the marriage."

**2.** A "vested" pension right is one in which the right to be paid is not subject to forfeiture if the employment relationship terminates before the employee retires. *Brown, supra*, 15 Cal.3d at 842, 544 P.2d at 563, 126 Cal.Rptr. at 635, 94 A.L.R.3d at 166–67. Vested rights must be distinguished from "matured" rights, which are unconditional rights to immediate payment. Often an employee's right vests after a certain term of employment but will not mature until the employee reaches retirement age and elects to retire. *Id.*

**3.** A "non-vested" pension right is one which is forfeited if the employment relationship terminates before retirement, e.g., because the employee quits, is discharged, or dies. *Brown, supra*, 15 Cal.3d at 842, 544 P.2d at 563, 126 Cal.Rptr. at 635, 94 A.L.R.3d at 166–67.

*Van Loan, supra*, 116 Ariz. at 274, 569 P.2d at 216. *Accord, Bloomer v. Bloomer*, 84 Wis.2d 124, 267 N.W.2d 235 (1978); *Brown, supra; Cearley v. Cearley*, 544 S.W.2d 661 (Tex.1976); *Ramsey v. Ramsey*, 96 Idaho 672, 535 P.2d 53 (1975); *DeRevere v. DeRevere*, 5 Wash.App. 741, 491 P.2d 249 (1971); *LeClert v. LeClert*, 80 N.M. 235, 453 P.2d 755 (1969). The difficulty in the present case arises in attempting to determine the exact dollar amount of the wife's community interest in the husband's pension.

A non-employee spouse may be awarded his or her community interest in the employee spouse's pension benefits under either of two methods. The first has been called the "present cash value method," in which the court determines the community interest in the pension[4], figures the present cash value of that interest, and awards half of that amount to the non-employee spouse in a lump sum, usually in the form of equivalent property; the employee thus receives the entire pension right free of community ties. Under the "reserved jurisdiction method," the court determines the formula for division at the time of the decree but delays the actual division until payments are received[5], retaining jurisdiction to award the appropriate percentage of each pension payment if, as, and when, it is paid out. DiFranza, *supra*; Hardie, *supra*.

The present cash value method provides a number of advantages over the reserved jurisdiction method[6], especially

**4.** The community share of the pension is determined by dividing the length of time worked during the marriage by the total length of time worked toward earning the pension. *In re Marriage of Judd*, 68 Cal.App.3d 515, 522, 137 Cal.Rptr. 318, 321 (1977).

**5.** The court determines the community share of the pension as in footnote 4, *supra*, multiplies each future pension payment by that figure to determine what part of the payment is community property, then divides that part between the spouses.

**6.** The major disadvantage of the present cash method is that the employee spouse bears the risk of paying the community for rights which may never mature. *In re Marriage of Skaden*, 19 Cal.3d 679, 688, 566 P.2d 249, 253, 139 Cal.Rptr. 615, 619 (1977). Additionally, the

when the anticipated date of retirement is far in the future. The former spouses are spared further entanglement because the litigation is completed, and the problems of continued court supervision and enforcement of the employee's duty to pay the ex-spouse's share are avoided. It is our view that the present cash value method is preferred if the pension rights can be valued accurately and if the marital estate includes sufficient equivalent property to satisfy the claim of the non-employee spouse without undue hardship to the employee spouse. DiFranza, *supra*; Hardie, *supra*.

■ In this case the present cash value method is clearly preferable in that the reserved jurisdiction method would require continued court supervision for at least 15 years. Moreover, the Johnsons' marital estate has sufficient other property available to make a current equitable division of all community property including the wife's interest in the pension fund.

■ The accuracy of any attempt to value a retirement plan is heavily dependent upon the type of plan which confronts the court. The two major kinds of pension plans are "defined contribution" and "defined benefit" plans. *See* DiFranza, *supra*; Hardie, *supra*; Luther, Luther, and Urie, *Equal Treatment for the Community Property Rights of Nonemployee Spouses*, 8 Community Prop. J. 91, 93 (1981); Projector, *Valuation of Retirement Benefits in Marriage Dissolutions*, 50 L.A.B.Bull. 229,

230–31 (1975) [hereinafter cited as Projector]. Under a defined contribution plan, a specified amount of money is periodically contributed to a fund by the employer, the employee, or both. This fund is invested and the earnings are divided proportionally among all plan participants. At any moment in time, there is a specific amount of money assigned to the account of each participant. These plans are thus analogous to a savings account. The total amount of benefits receivable under such a plan depends upon the success of fund investments. By contrast, under a defined benefit plan, the benefits are specified in advance, usually as a percentage of salary and related to years of service, and no account is kept for the employee. Both the pension and profit sharing programs in the present case are in the nature of defined contribution plans, as shown by the specific amounts that are credited to the husband's account.

■ With either type of plan, its present cash value must be determined before a present lump-sum satisfaction of the parties' interests can be made. Various actuarial calculations are used to discount the present value of the retirement plan to reflect contingencies affecting the eventual payout, including discounts for mortality[7], interest[8], probability of vesting[9], and probability of continued employment[10]. However, not all of these calculations are applicable to every retirement plan:

---

employee may feel cheated because he or she receives only an "expectancy" of receiving money in the future, while the non-employee spouse receives "real" assets such as home equity or stocks. Hardie, *supra* at 110.

7. If the right to be paid under the plan is contingent upon the employee's surviving to a certain age, the calculation of present value must take into account the probability that the employee will attain that age, based on standard mortality tables and on the employee's physical condition.

8. This involves discounting the value of the sum to be obtained in the future to take account of the interest that could be earned if the money were available for investment today.

9. If the employee's rights under the plan have not yet vested or are subject to divestment, the present value should be discounted to reflect the possibility that the rights will not vest or may be divested.

10. Most pension plans provide increased benefits for longer-term employment. In defined contribution plans, the longer employment period results in more total contributions to the fund. Under defined benefit plans, the benefits are usually set at a percentage of the average salary during the employee's last three or five years of employment. The longer the employee continues to work, the higher the ending salary is likely to be, and the higher the eventual benefits will be. DiFranza, *supra* at 466.

Valuation depends in part on the type of plan involved. In a defined contribution plan, employing individual accounts to which contributions are credited, the best estimate of present value is the amount currently credited to the employee's account. An adjustment, however, must be made if the account figure is not vested or if it is not payable when the employee dies prior to reaching retirement age. If those factors are present, then the account balance must be discounted for the probability of vesting and for the probability of survival to retirement.

Bonavich, *Allocation of Private Pension Benefits as Property in Illinois Divorce Proceedings*, 29 DePaul L.Rev. 1, 28 (1979) (footnotes omitted). *See also* DiFranza, *supra*, at 465–67; Hardie, *supra*, at 107–08; Projector, *supra*, at 237.

 In the present case the employee's rights in the plans are vested and are not subject to forfeiture if death occurs prior to retirement. Therefore, the discounts for mortality and probability of vesting are inapplicable here. Under a defined contribution plan, the probability of continued employment discount does not significantly alter the *present* cash value of the plan. The interest discount is also inapplicable because a defined contribution plan is presently earning interest for the employee. Projector, *supra* at 237. The trial court incorrectly discounted the value of the fund because no consideration was given to the fact that the fund was earning interest and would continue to earn interest. There was no need to discount the value of the account because the value of a defined contribution plan, such as that of appellee, is the present amount credited to the account. *See Bloomer v. Bloomer*, 84 Wis.2d 124, 267 N.W.2d 235 (1978); *Everson v. Everson*, 24 Ariz.App. 239, 537 P.2d 624 (1975); *Berry v. Board of Retirement*, 23 Cal.App.3d 757, 100 Cal.Rptr. 549 (1972); *Laffitte v. Laffitte*, 232 So.2d 92 (La.App.1970).

## FAILURE TO CONSIDER TAX AND INFLATIONARY CONSEQUENCES IN VALUING THE HUSBAND'S INTEREST

 The appellee argues that the current value of the retirement account fails to take into consideration the effects of inflation and taxes on the value of his interest in the pension plans, thus reaching an artificially high valuation of that interest. He contends that if the pension account were "sold" now to a financing institution, the discount rate would be at least 30%. He also alleges that current valuation methods treat "before tax" contributed dollars the same as "after tax" dollars which will eventually be paid out, despite an alleged 60% difference in actual worth.

We are not persuaded by these arguments. In *In re Marriage of Marx*, 97 Cal.App.3d 552, 159 Cal.Rptr. 215 (1979), the husband contested the court's valuation of his pension fund at the face value of the contributions deposited on the same grounds raised here. The California Court of Appeal found that the pension plan would not mature until 1990, and that the tax consequences the husband would then face were too speculative for present determination. The court pointed out that tax rates change and that the husband's tax bracket would probably change after his retirement. Likewise, the effects of future inflation were currently unknown. Relying upon *In re Marriage of Fonstein*, 17 Cal.3d 738, 131 Cal.Rptr. 873, 552 P.2d 1169 (1976), which authorized the court to ignore speculative future tax consequences, the *Marx* court held that the tax and inflationary consequences could be ignored in figuring the present value of the husband's interest [11]. We find this reasoning persuasive and decline to consider the speculative future effects of taxes and inflation.

## CHARACTERIZATION OF DEBTS AS COMMUNITY OBLIGATIONS

 Appellant finally contends that the trial court erroneously classified certain ob-

---

11. However, the *Marx* court pointed out that if the future maturity date were close to the trial date, the tax consequences could be immediately and specifically determined. In such a case, the court should consider the effects of taxation on the valuation. 97 Cal.App.3d at 560 n.5, 159 Cal.Rptr. at 220 n.5.

ligations as debts of the community. In our review of the trial court's findings, we will view the evidence in the light most favorable to supporting the decision below. *Sommerfield v. Sommerfield*, 121 Ariz. 575, 577, 592 P.2d 771, 773 (1979). The finding of the trial judge will be sustained if there is any reasonable evidence to support it. *Donato v. Fishburn*, 90 Ariz. 210, 213, 367 P.2d 245, 246 (1961).

 The record in the present case reveals that the husband borrowed sums of money during the marriage and used his separate property as security for these loans. It is undisputed that these debts were intended to and did confer benefits on the community. Normally, we would end our inquiry at this point, based upon the general rule that where either spouse incurs an obligation during marriage for the benefit of the community, that debt is presumed to be a community obligation. *Donato, supra*, 90 Ariz. at 213, 367 P.2d at 246; *LeBlanc v. Waller*, 603 S.W.2d 265, 266 (Tex. Civ.App.1980); *Simplot v. Simplot*, 96 Idaho 239, 526 P.2d 844, 851 (1974).

 Appellant, however, argues that this presumption was based upon certain Arizona statutes (A.R.S. §§ 25–211(B), 216), which formerly gave the husband sole managerial control over the community[12]. This argument gains support from statements in *Hofmann Co. v. Meisner*, 17 Ariz.App. 263, 497 P.2d 83 (1972) and *Garrett v. Shannon*, 13 Ariz.App. 332, 476 P.2d 538 (1970), in which the court of appeals stated:

> In situations involving a contract debt or other contractual obligation, it is well established by many Arizona decisions that if such debt or contractual obligation was

incurred during coverture, it is presume to be a community debt. [citations omitted] This presumption is undoubtedly based upon the provisions of A.R.S. §§ 25–211, subsec. B and 25–216, subsec. B, which deal with the authority of the husband to dispose of community personalty and to contract for community debts.

*Id.* at 333–34, 476 P.2d at 539–40. Appellant further argues that since these statutes have now been repealed[13], the basis for the presumption is gone and therefore the presumption itself should be discarded. In *Donato, supra*, this court did mention the husband's sole managerial control in the same opinion in which we made reference to the community debt presumption. 90 Ariz. at 213, 214–15, 367 P.2d at 246, 247. However, nothing in that opinion leads us to believe that such control is a strict prerequisite to the presumption. Moreover, as authority for the presumption, we cited a number of our older decisions to the same effect, none of which relied on the husband's sole managerial control for its holding. *Morgan v. Bruce*, 76 Ariz. 121, 124–25, 259 P.2d 558, 560 (1953); *McFadden v. Watson*, 51 Ariz. 110, 113, 74 P.2d 1181, 1182 (1938); *Cosper v. Valley Bank*, 28 Ariz. 373, 382, 237 P. 175, 178 (1925). We find that a valid statutory basis for this presumption still exists, namely A.R.S. § 25–214(B), which gives both spouses "equal power to bind the community," and § 25–214(C), which provides that "[e]ither spouse separately may . . . bind the community" except in listed transactions. Since both spouses now have equal power to manage the community, we believe the rationale of cases such as *Ells-*

---

12. Former A.R.S. § 25–211(B) read:
"During coverture, personal property may be disposed of by the husband only."
Former A.R.S. § 25–216(B) read:
"The community property of the husband and wife is liable for the community debts contracted by the husband during marriage unless specially excepted by law."
*See also* former A.R.S. § 25–214(A), which read:
"Married women of the age of twenty-one years and upwards have the same legal rights and are subject to the same legal liabilities as

men of the age of twenty-one years and upwards except the right to make contracts binding the common property of the husband and wife."

13. Former A.R.S. § 25–211(B) was repealed by Laws 1973, Ch. 172, § 61. Former A.R.S. §§ 25–214(A) and 25–216(B) were repealed by Laws 1973, Ch. 172, § 63, effective August 8, 1973. For a critique of these former provisions, *see* Comment, *Community Property: Male Management and Women's Rights*, 1972 Law & Soc. Order 163.

*worth v. Ellsworth*, 5 Ariz.App. 89, 423 P.2d 364 (1967) now applies equally to debts incurred by either spouse, although in that case the husband had incurred the debt: "If the husband acts with the object of benefiting the community, a fact not questioned here, the obligations so incurred by him are community in nature, whether or not the wife approved thereof." *Id.* at 92, 423 P.2d at 367. *Accord, Hofmann Co. v. Meisner, supra.* Indeed, one of our earlier opinions clearly recognized that the presumption has always been oriented toward both spouses: "[T]he presumption of law is, in the absence of the contrary showing, that all property acquired and all business done and transacted during coverture, *by either spouse*, is for the community." *Benson v. Hunter*, 23 Ariz. 132, 134–35, 202 P. 233, 233–34 (1921) (emphasis added). *See also Bank of Washington v. Hilltop Shakemill, Inc.*, 26 Wash. App. 943, 948, 614 P.2d 1319, 1321 (1980); *Oil Heat Co. of Port Angeles, Inc. v. Sweeney*, 26 Wash.App. 351, 353, 613 P.2d 169, 171 (1980). Thus, the presumption of community debt remains in force despite the fact that the husband is no longer the sole manager of the community. These cases apparently recognize that the character of an obligation incurred during marriage depends upon whether the borrowing spouse intends to use the proceeds of the loan to benefit the community when the debt is incurred. In the present case, it is undisputed that the loans were taken out to benefit the community; therefore, the debts are obligations of the community.

Nor do we see any reason why the presumption should be negated by the fact that the husband used his separate property to secure the community loans. There are no Arizona cases precisely on point, although *Malich v. Malich*, 23 Ariz. 423, 429, 204 P. 1020, 1022 (1922) stated in dicta that "property purchased on credit belongs to the community where it has not been acquired upon a pledge or mortgage of separate property," citing *Heney v. Pesoli*, 109 Cal. 53, 41 P. 819 (1895). However, in *Heney* the intent of the married couple was that the wife should use the loan proceeds to increase her separate estate. The Cali-

fornia court ruled that the intent of the parties controlled whether the money she borrowed on the security of a mortgage on her separate property made the newly acquired property her separate property. *Id.* at 62, 41 P. at 822. We do not believe the dicta in *Malich, supra,* is controlling.

Support for the community purpose theory occurs in other community property states. For instance, the Washington Court of Appeals has stated:

> The "acid test" for determining whether the obligation or liability is separate or community in nature is the purpose for which the note is executed. [citations omitted] If the note is executed for the benefit of the marital community, the presumption of community obligation is not overcome. Thus money borrowed to pay off a community debt or to acquire a community asset is for a community purpose.

*National Bank of Commerce of Seattle v. Green*, 1 Wash.App. 713, 717, 463 P.2d 187, 190 (1969), in which the court also found that "even a community debt may be secured by separate property." *Id.* at 719, 463 P.2d at 190. *Accord, Finley v. Finley*, 47 Wash.2d 307, 287 P.2d 475 (1955). The same rule has been applied by the Texas Court of Civil Appeals, which has stated:

> [W]here money is borrowed after marriage it is presumed to be borrowed for the benefit of the community, in absence of a contrary showing; . . . and the indebtedness is regarded as a community debt, even though it is secured by a pledge of the separate property of one spouse or the other.

*Foster v. Hackworth*, 164 S.W.2d 796, 799 (Tex.Civ.App.1942). *See also Armstrong v. Turbeville*, 216 S.W. 1101, 1105 (Tex.Civ. App.1919). These cases show that the mere fact that the borrowing spouse's separate property was used as security for the loan does not overcome the presumption that a debt incurred during marriage with the intent to benefit the community is a community obligation.

The foregoing cases deal with disputes solely between the divorced parties and do not involve the rights of any third party. We limit the application of our ruling to actions between the spouses.

 We have also reviewed appellant's claims of error in the trial court's determination of spousal maintenance, child support, and valuation of the family residence. We find reasonable evidence to support the findings of the trial court on these issues, and therefore, sustain them. *Sommerfield v. Sommerfield, supra; Donato v. Fishburn, supra.*

The judgment of the superior court is affirmed in part and reversed in regard to the division of the husband's pension benefits. The matter is remanded to the superior court for further proceedings consistent with the views expressed in this opinion.

STRUCKMEYER, C. J., and HAYS, CAMERON and GORDON, JJ., concur.