808 P.2d 1234

**In re the Marriage of Edward N. COOPER, Petitioner/Appellant, Cross–Appellee,**

v.

**Betty J. COOPER, Respondent/Appellee, Cross–Appellant.**

**No. 2 CA–CV 89–0217.**

Court of Appeals of Arizona, Division 2, Department B.

Nov. 29, 1990.

Review Denied May 7, 1991.

Gaila Davis, Tucson, for petitioner/appellant, cross-appellee.

Roberta J. Jensen, Tucson, for respondent/appellee, cross-appellant.

## OPINION

HOWARD, Judge.

This appeal concerns the trial court's distribution of the husband's retirement benefits 11 years after the marriage was dissolved pursuant to A.R.S. § 25–318(B). Both parties contend that the trial court abused its discretion in its division of the benefits, and the wife has cross-appealed the reduction of her spousal maintenance.

## FACTS AND PROCEDURAL HISTORY

Edward and Betty Cooper were married on June 5, 1948 and divorced on November 4, 1977. The decree of dissolution ordered, inter alia, that Edward pay $350 per month in spousal maintenance because Betty had insufficient property, was not capable of finding adequate employment and was caring for the couple's two minor children.

At the time of dissolution, Edward had been employed as a pipefitter with R.E. Lee Mechanical Contracting, Inc. since the early 1960's and had earned 15.5 service credits in a defined benefit retirement plan [1] provided by Arizona Pipe Trades. At

---

1. Under a defined benefit plan, the benefits are usually set at a percentage of the average salary during the employee's last three or five years of employment. See *Johnson v. Johnson*, 131 Ariz. 38, fn. 10 at 42, 638 P.2d 705, 709 (1981). In this case, Edward's retirement benefits are relat-

the time of dissolution, the value of the credits was as follows: one credit for past service valued at $22, and 14.5 credits for future service also valued at $22 each. His benefits were vested, and there was no maturity date, although normal retirement age at that time was age 65. It was later changed to age 62. In 1977, Edward was 53 years old. The earliest that Edward could draw benefits was when he reached age 55, but if he retired then, he would take a 45 percent reduction in the monthly benefit for the early retirement. His plan had no provision for cash out prior to retirement.

During the dissolution proceedings, Edward's pension plan was not included on any property lists, and the decree did not divide or even mention these benefits. There is no trial transcript accompanying the record on appeal, and there is a dispute as to whether pension evidence came before the court. However, both parties concur that both Betty and Edward were aware of Edward's pension at the time their marriage was dissolved and that the benefits were not distributed by the court.

Edward retired from R.E. Lee on January 1, 1988, at age 64, with full pension benefits. The value for his one past work service credit had increased to $28. Edward had earned 10.25 additional future service credits for a total of 24.75, and their value increased to $53 each. Therefore, Edward was receiving a pension benefit, as of January 1, 1988, of $1,340 per month.

On May 17, 1988, Edward filed a motion to modify support and petition for an order to show cause stating that he had retired and that his income was reduced. The record shows that Edward's monthly income at the time of the divorce was $1,551.48 and his expenses were $1,066. In 1988, his monthly income was listed as $1,891 and expenses/payments as $1,850. Edward allegedly did not include an average of $633 in earnings from R.E. Lee from January to June 1988 on his 1988 affidavit, although he testified that he received these monies.

On the other hand, Betty's income at the time of the divorce was zero and her monthly expenses were $500. In 1988, her affidavit stated that she received $173 per month in general assistance and had expenses/payments of $962.46 per month. At age 60, she was uneducated and had never had a steady job, having done some babysitting and housekeeping. Betty also testified that she was physically disabled from a 1963 car accident and also suffered from arthritis and other ailments.

Betty responded to Edward's petition by stating that Edward's income had increased, not decreased, since retirement. She asked for an increase of spousal maintenance. She also filed a petition to dispose of undisclosed community property, praying that the court distribute Edward's pension benefits as undistributed property owned since the divorce by both parties as tenants in common pursuant to A.R.S. § 25–318(B). Betty also filed a counter petition for an order to show cause why Edward should not pay spousal maintenance arrearages for the periods January 1, 1988 through October 1, 1988, when Edward stopped payment, and for shortages in his payments from 1983 through 1987, for a total arrearage demand of approximately $3,500.[2]

At a hearing on both petitions on August 4 and continued on August 13, 1988, Betty alone presented evidence as to the amount of benefits due her. The court took the matter under advisement.

On October 25, 1988, the court made an under-advisement ruling finding that the retirement benefits were undistributed community assets, and it awarded Betty 30 percent of Edward's current benefits based on Betty's evidence. The ruling also terminated Betty's spousal maintenance, finding that: (1) she could support herself; (2) she no longer had to care for minor children;

---

ed to his years of service and earned as "credits." The monthly retirement benefit is figured by multiplying an assigned value per credit times the number of credits earned.

**2.** On appeal, Betty adjusted this total to $1,892.

and (3) she had made no effort since 1977 to find employment or gain new skills.

Betty immediately filed a motion to clarify the ruling. In the meantime, when Edward's attorney did not prepare the written order as directed by the minute entry, Betty's attorney did so. Pending action on Betty's motion to clarify, the court signed the written order on December 8, 1988, but later vacated it as a "mistake."

The court held a hearing on the motion to clarify. Following this hearing, an under advisement ruling was issued on January 24, 1989, which reversed the court's previous distribution scheme. The court concluded that "as a matter of law ... the only community benefit that the court could have distributed at the time of the decree was the actual value of the pension at the time of the decree" and declared that Edward's "enhanced pension benefits earned following the divorce are his separate property." The court indicated at the hearing that its ruling change was based on a review of current retirement benefit law, specifically *Koelsch v. Koelsch*, 148 Ariz. 176, 713 P.2d 1234 (1986):

> [T]he *Koelsch* [sic] case makes it very clear that it is preferred that the amount of a pension be valued at the time of the dissolution, a one-time payment, and that payment should be figured from ... what the cash value is of the pension then.

In addition, the record shows that the court was concerned with the equity of awarding Betty these benefits after she had received $350 per month in spousal maintenance for 11 years. It stated:

> So, the equitable thing that I was trying to do here was to give her her share of community property but have her bear in mind the fact that she also received spousal maintenance at a time when she wasn't ... off-setting her community property. Spousal maintenance is awarded on the basis of how much property the person has and if the amount of property the person has with which to support themselves varies, the amount of spousal maintenance would vary.... So that was why I did what I did....

The court reopened the case on April 3, 1989 to accept evidence on the value of Edward's pension at the time of dissolution only. Betty's expert witness calculated the value of Edward's pension in October 1977, using several factors, including the increases in credit value until Edward's retirement, and obtained a figure of $15,000 to $16,000 as Betty's share of the October 1, 1977 benefits. The witness testimony emphasized the significance of the increases as a factor in the actuarial analysis:

> Q. Mr. Hopper, if we had come to you in 1977 and asked you to actuarialize the value of the pension, what would that have meant to you to do?
>
> A. Well, that would have been what I, what I just did. I would have known, I believe, those increases are part of the plan and if you don't take those into account, you are underestimating the value of the plan. The plan is more valuable then [sic] one that does not have increases.
>
> Q. Okay. Is this a defined benefit plan or defined contribution plan?
>
> A. It's a defined benefit plan.
>
> Q. What does that mean?
>
> A. That means that retirement benefits are determined by a formula which is usually related to years of service and in some cases, related to salary, although that's not the case in this plan.
>
> Q. Oh, in this plan, it's related to the years of service?
>
> A. That's right.
>
> Q. And in a defined benefit plan, does it normally have built-in intrinsic or inherent increases?
>
> A. Many plans—well, plans that are related to salary have a benefit in inflationary increase. Plans such as this one where there is a unit benefit, the increases are not part of the planned [sic] documents but they are part of the way the plan is administered over a period of years.

On the other hand, Edward's expert witness calculated a figure based only on the accrued vested monthly benefit of $341 derived from 15.5 years of credit multiplied by the 1977 rate of $22 per credit, and then

discounted that amount to present value. His figure for Betty's share was $11,-453.90. Testimony reveals that he did not factor in the increases in credit value after October 1, 1977:

Q. Okay, and did you also come up with a dollar value on the pension plan?

A. Yes, I did.

Q. And that would have been what you considered the dollar value in 1977; is that right?

A. Yes, it would have been the presumed date of calculation would have been the present value as of October 1, 1977.

Q. Okay.

A. Based upon an accrued vested monthly benefit of $341 which is the figure I received over the telephone, applied fifteen-and-a-half years credit service and the $22 per month per year service benefit. It also assumes a normal retirement age of 62 and presumes that the entire benefit was accrued during the marriage.

Q. Okay.

A. The 1971 group annuity mortality table was used, a 6.75 percent interest rate both for the annuity calculations and for the present value calculations.

What that boils down to is that as of October 1, '77, I calculate the community interest was worth $22,907.80 which will mean that the spousal portion would be half of that or $11,453.90.

\* \* \* \* \* \*

Q. Mr. Turner, your calculations are based upon the assumption that there are no increases in the value of the credits beyond 1977?

A. That's correct.

Q. And do you know if he had retired then whether he would have received any increases?

A. Testimony in the courtroom today has indicated that, yes, he would.

Q. And would that have made a difference in your calculations had you known this last week?

A. No.

Q. Why not?

A. My instructions were to base them on a present value of the benefits as of October 1, 1977, *as if they had been paid on that date*. That being in my mind, that being the case, the accrued benefit on that date would not have included increases *or the right to such*.

(Emphasis added.)

The court also precluded any testimony regarding the current value of the credits, as indicated in the following transcript:

MS. JENSEN: Your honor, what we are trying to establish is that though the credits were worth $22 then, due to the inherent intrinsic quality of credits themselves, they have increased in value.

THE COURT: Oh, no, no, no, no, no. That would not be relevant to anything that I would have to determine.

The signed minute entry filed May 2, 1989, ordered judgment for Betty in the amount of $11,453.90 with interest at six percent from October 1, 1977, to December 14, 1979, and at 10 percent interest thereafter until paid. It noted that Betty "sat on her claim for approximately 10 years." Regarding spousal maintenance, the court found that there were changed circumstances since the time of dissolution and reduced the spousal maintenance to $150 per month. The changed circumstances found were as follows: (1) There are no longer minor children at home; (2) both parties have serious health problems; (3) Edward has retired; (4) Betty has taken school loans but has made no extended or serious efforts to retrain herself; (5) Betty is eligible for SSI or other benefits; and (6) Betty has sole and separate property, namely her half interest in the cash value of the pension, with interest that has accrued thereon.

Timely motions for reconsideration were filed. Betty filed a motion for a new trial, which was denied, and appeals were timely filed.

## ISSUES ON APPEAL

Edward's appeal concerns whether the court had jurisdiction to divide his pension benefits under A.R.S. § 25–318(B) and, if

so, whether it was correct to order interest on Betty's share from the date of the decree.

On cross-appeal, Betty argues that the court erred in its ruling that *Koelsch* controls this case and in its interpretation and application of *Koelsch*. She argues that the court erred in ruling that there are changed circumstances which mandate a reduction in spousal maintenance, and in not addressing the issue of spousal maintenance arrearages. She also contends that procedural errors of opposing counsel and the trial court highly prejudiced Betty's case.

Because we affirm the court's jurisdiction but find that the trial court abused its discretion in its distribution of Betty's share of retirement benefits, the issues of interest and alleged errors by court and counsel will not be addressed.

### EDWARD'S CONTENTION

■ The trial court found that the retirement benefits were undisposed of community property now divisible as property held as tenants in common under A.R.S. § 25–318(B), which provides:

B. The community, joint tenancy and other property held as tenants in common for which no provision is made in the decree shall be from the date of the decree held by the parties as tenants in common, each possessed of an undivided one-half interest.

On appeal, we view the evidence in the light most favorable to supporting the decision below, and the finding of the trial judge will be sustained if there is any reasonable evidence to support it. *Johnson v. Johnson*, 131 Ariz. 38, 638 P.2d 705 (1981).

Edward does not dispute that the retirement benefits were community property at the time of dissolution, but argues that the trial court does not have jurisdiction to divide the retirement benefits under A.R.S. § 25–318(B) because this statute only applies to cases where property has been overlooked, unknown or secreted. See *Dunbar v. Dunbar*, 109 Ariz. 395, 510 P.2d 41 (1973). He contends that the retirement benefits were not overlooked here, where both parties were aware of the benefits but division of the benefits was not accomplished. However, the trial court found that the statute does apply here, and we agree.

■ Even though both parties knew of the benefits, there is no mention of the retirement benefits on either party's property inventories and no evidence in the record on appeal that the dissolution court heard testimony regarding the retirement benefits or that it took the benefits into consideration. The trial transcript is not included on appeal, but when a partial record is insufficient to decide an issue, the appellate court will assume the trial court was correct in its assessment. *Czarnecki v. Czarnecki*, 123 Ariz. 478, 600 P.2d 1110 (App.1978), approved, 123 Ariz. 466, 600 P.2d 1098 (1979). Furthermore, the dissolution decree did not mention the retirement benefits.

The retirement benefits here were community property for which no disposition was made in the decree and, therefore, they were held by the parties as tenants in common pursuant to A.R.S. § 25–318(B), thus giving Betty the right to bring an action to divide the property at any time. *Beltran v. Razo*, 163 Ariz. 505, 788 P.2d 1256 (1990); *Carpenter v. Carpenter*, 150 Ariz. 62, 722 P.2d 230 (1986).

### BETTY'S CROSS–APPEAL

■ Betty contends that the trial court abused its discretion by inequitably determining her share of the retirement benefits. In examining her contention, we keep in mind that pension plans are a form of deferred compensation to employees for services rendered, and any portion of the plan earned during marriage is community property subject to equitable division at dissolution. *Koelsch v. Koelsch*, supra. The trial court is not required to make an absolutely equal distribution of the community property as long as it does not appear that the trial court's disposition of the estate is inequitable or unfair. In effecting a fair and equitable distribution, the trial court is given broad discretionary power,

and it is only where there is a manifest abuse of that discretion that an appellate court will interfere. *Wick v. Wick*, 107 Ariz. 382, 489 P.2d 19 (1971).

■ In addition, it is settled that property division and spousal maintenance are two separate and distinct considerations at dissolution and that increased spousal maintenance cannot justify depriving a spouse of his or her property right. *Koelsch v. Koelsch*, supra. In accepting the lowest amount for Betty's pension, the court noted that Betty did not off-set the spousal maintenance she received over the previous 11 years. To the extent that the court decided the issue on this basis, we hold that this was an improper consideration in making the correct property division. Since the court further used its interpretation of *Koelsch* to justify its division, we next review its discretion on this basis.

### A. *Misapplication of Koelsch*

In Betty's cross-appeal, she argues that the court misapplied *Koelsch* in its method of dividing the retirement benefits because in figuring the lump sum 1977 value, it did not consider the increases in value of the service credits earned by Edward from dissolution until the normal retirement date. Furthermore, she argues that *Johnson v. Johnson*, supra, more appropriately instructs that the reserved jurisdiction method and not the lump sum method should have been applied in this case.

*Koelsch* was a consolidation of two cases where the husband who was eligible to retire under the Public Safety Personnel Retirement System chose to continue working past normal retirement, thus delaying receipt of retirement benefits and at the same time increasing the benefits by adding a bonus to the salary for the extra years. In that plan, employees contributed eight percent of their compensation, and the benefit was calculated as a percentage of the highest final three-year wages. The lower court ordered that it would reserve jurisdiction until the husband chose to retire, but it would compensate the wife for the risks of waiting by factoring in the husband's increases based on a percentage of increased post-normal retirement salary.

Our supreme court held that this distribution would be impossible since the husband's post-dissolution earnings were his separate property not subject to the court's jurisdiction. In these cases, however, the husband's post-dissolution earnings were also his post-normal retirement earnings. The court held that the correct community property portion would be the lump sum present value at the time of dissolution, based on the benefit as of the maturity or normal retirement date. The opinion stated:

> By fixing the percentage of the community property interest as of the date of dissolution and the amount of the benefit as of the date of maturity, we avoid the problem of dividing the fruits of separate labor....

148 Ariz. at 184, 713 P.2d at 1242.

Edward's retirement plan is distinguishable from that in *Koelsch*. Unlike the *Koelsch* benefits, which would have been calculated on separate earnings post retirement, Edward's benefits are determined by multiplying an administratively assigned value per credit times the number of service credits he has earned at time of normal retirement. In addition, the *Koelsch* plan was a defined benefit plan which required employee contributions. The benefit was calculated as a percentage of the salary earned. Edward's plan is non-contributory, and the benefit is not calculated as a percentage of his salary.

*Koelsch* holds only that in a contributory plan, where the defined benefit is based on a percentage of the post-dissolution earnings, the court has no jurisdiction over the husband's post-dissolution separate benefits earned after the normal retirement date. The opinion states:

> If the amount of the monthly benefit is greater than the monthly benefit would have been had the employee spouse retired at the normal retirement date, any increases would be due to separate labors of the employee spouse.

148 Ariz. at 182, 713 P.2d at 1240.

■ In a defined benefit plan like Edward's, increases that ultimately determine

the matured benefit are, until normal retirement or maturation date, simply unvested benefits, the right to which has been earned by the employee spouse, here, partly during marriage. *Van Loan v. Van Loan,* 116 Ariz. 272, 569 P.2d 214 (1977). Betty has an interest in that portion of these unvested benefits which are community property. *Id.; In re Marriage of Judd,* 68 Cal.App.3d 515, 137 Cal.Rptr. 318 (1977). The nature of a defined benefit plan is that benefits are administratively determined and are not earnings per se. In a 1972 California Supreme Court case, the court upheld an award of benefits to the wife of a judge which was based on a percentage of an increased salary to the husband's successor in office. The husband argued that this was separate property, but the court disagreed:

> The plan of payment of the pension—whether fixed or reflective of subsequent salary increases in the relevant position—does not change the nature of the right to the pension. The right flows from the services rendered by the employee during marriage; the manner of expression of the right does not distort it or alter its community characteristic.

*Waite v. Waite,* 6 Cal.3d 461, 99 Cal.Rptr. 325, 331–33, 492 P.2d 13, 19–20 (1972), overruled on other grounds, *In re Marriage of Brown,* 15 Cal.3d 838, 126 Cal.Rptr. 633, 544 P.2d 561 (1976). There is expert testimony here that the credit value increases in Edward's plan are similarly a "part of the way the plan is administered over a period of years," and that "if you don't take those into account, you are underestimating the value of the plan."

Edward contends on appeal that *Koelsch* effectively rejected the California position by disagreeing with *In re Marriage of Gillmore,* 29 Cal.3d 418, 174 Cal.Rptr. 493, 629 P.2d 1 (1981) in its footnote 7. 148 Ariz. at 183, 713 P.2d at 1240. We note, however, that *Gillmore* also concerned post-normal-retirement increases.

We also note Justice Holohan's dissent in *Van Loan v. Van Loan,* supra, cited in *Koelsch,* where he stated that any and all post-dissolution increases are separate property. We believe this blanket statement fails to account for the differences in benefit plans, i.e., defined contribution versus defined benefit, and if applied here would inadvertently overrule *Johnson v. Johnson,* supra.

■ In a defined contribution plan, there is a specific amount of money assigned to the participant's account at any moment in time and the best estimate of present value is the amount currently credited the employee. *Johnson v. Johnson,* supra. By contrast, in Edward's defined benefit plan, no account is kept for the employee. The present value must be determined according to the amount anticipated to be payable at normal retirement discounted by various factors to reflect risks inherent in awarding the money early. Such a calculation must include the inherent increases in credit value.

## B. *Actual vs. Actuarial*

■ In addition, Betty argues that the lump sum present value calculation of Edward's expert witness, accepted by the trial court, is not a true actuarial figure required for this type of plan. We agree.

The trial court's error resulted from its confusion regarding plan types. The court ruled that as a matter of law the only benefit subject to division by the court in 1989 is the "actual value" of the pension at the time of the dissolution decree and found that the actual value was the value of the credits earned to date multiplied by Edward's then number of years of service—a benefit of $341 per month. It then discounted that amount actuarially. In so doing, it erred by treating a non-contributory, non-cash-out plan like a contributory, cash-out plan.

The court must value the pension benefits as of October 1, 1977 actuarially, *Tester v. Tester,* 123 Ariz. 41, 597 P.2d 194 (App.1979), including all factors affecting the final pension benefit. *Pangburn v. Pangburn,* 152 Ariz. 227, 731 P.2d 122 (App.1986).

### C. *Reserved Jurisdiction Method*

 Betty also contends that the reserved jurisdiction method should have been used and not the lump sum present value method in determining Betty's undivided interest in the community share. Unlike the *Koelsch* plan, Edward's retirement plan was not matured and payable at the time of dissolution. Neither he nor Betty could draw benefits then. In fact, Edward had to work nine more years to reach full benefits at normal retirement under the plan, which had been changed from age 65 to age 62. The *Koelsch* court indicated that our supreme court had already considered the case of non-matured benefits in *Johnson v. Johnson,* supra. We agree with Betty and with the *Koelsch* court that *Johnson* controls in this case.

*Johnson* held that where the employee spouse does not have an immediate right to benefits, there are two methods for awarding the non-employee spouse his or her community interest: the present cash value method, which is preferred when there is sufficient equivalent property to satisfy the claim without undue hardship to the employee spouse, or the reserved jurisdiction method, which determines the community share at dissolution but applies it when the benefit is received. 131 Ariz. at 41, 638 P.2d at 708.

Both methods determine the community share of the pension by employing a time formula from California case law also known as the *Van Loan* formula. *Van Loan v. Van Loan,* supra. The rule states that where the total number of years served by the employee spouse is a substantial factor in computing the benefits that that spouse will receive, as is the case here, the community is entitled to have its share based upon length of service performed on behalf of the community in proportion to the total length of service necessary to earn those benefits. *In re Marriage of Judd,* supra; *Johnson v. Johnson,* supra.

The *Koelsch* court expressly refused to overrule the use of the time rule in a case like the present one:

We express no opinion on the validity of this formula in circumstances where the pension benefits are not matured and payable upon retirement except to note that the factors involved in such a case are different than those espoused in this opinion.

148 Ariz. at 182 n. 6, 713 P.2d at 1240, n. 6.

In this case, the present value method would not be appropriate because the distribution is retroactive and it is not a matter of substituting other property. In addition, it makes little sense to try to determine value retroactively when that value has arrived and is known.

On the other hand, the reserved jurisdiction method would be entirely appropriate since the benefits have, in the meanwhile, been set and received. Betty's share can be calculated according to the *Van Loan* formula and applied to the normal retirement date monthly amount. Betty presented evidence that her undivided one-half interest of the community property would be 30 percent of the paid benefits.

In summary, the trial court abused its discretion in restricting evidence to the actual value of the pension as of October 1, 1977, and we reverse and remand for a recalculation in accordance with this opinion.

### SPOUSAL MAINTENANCE

 The trial court reduced Betty's spousal maintenance from $350 per month to $150 per month based on evidence before the court of each party's income and situation as set forth above. Distribution of community property may be a justification for reducing spousal maintenance. *Norton v. Norton,* 101 Ariz. 444, 420 P.2d 578 (1966).

 We find that there is sufficient evidence to warrant the modification and that to have done so was not an abuse of discretion. Although Edward's income has increased since 1977, his expenses and payments have also increased. Betty will receive her portion of retirement benefits and no longer has minor children to care for.

Where, as here, there is sufficient evidence of a substantial and continuing change in circumstances as required by A.R.S. § 25–327, we cannot say the court abused its discretion in reducing maintenance. *Jarvis v. Jarvis*, 27 Ariz.App. 266, 553 P.2d 1251 (1976).

The court did not mention the demand for spousal maintenance arrearages in its ruling. It is settled that Betty has a vested right to receive the maintenance previously ordered and that, while the court has jurisdiction to modify the maintenance, it may not do so retroactively. *Jarvis v. Jarvis*, supra.

Betty raised the issue of the arrearages in a counter petition for an order to show cause filed on July 15, 1988. If a party petitions the court for a written judgment for the full amount of arrearages, the trial court has a mandatory duty to enter such judgment. *Tande v. Bongiovanni*, 139 Ariz. 346, 678 P.2d 531 (App.1984), approved in part and reversed in part on other grounds, 142 Ariz. 120, 688 P.2d 1012 (1984).

We hold that Betty is entitled to judgment for the arrearages in an amount to be determined by the trial court and it is ordered that the parties bear their own attorney's fees.

Affirmed in part, reversed and remanded in part.

FERNANDEZ, C.J., and ROLL, P.J., concur.