In re the **MARRIAGE OF John S. HUNT, Petitioner,**

and

**Dianna L. Hunt, Respondent.**

In re the **MARRIAGE OF Mark Stephen RAIMER, Petitioner,**

and

**Melissa Harte–Raimer, Respondent.**

Nos. 93SC565, 93SC631.

Supreme Court of Colorado.

Dec. 18, 1995.

Rehearing Denied (93SC631) Jan. 29, 1996.

Thomas, Porter, Spence & Patin, P.C., Arthur W. Porter, Bryan L. Hunt, Colorado Springs, for Petitioner John S. Hunt.

Susemihl, Lohman & McDermott, P.C., Richard V. Lohman, Catherine Woelk–Rudisill, Colorado Springs (William L. Carew, Colorado Springs, of counsel), for Respondent Dianna L. Hunt.

John E. Kirchner, Colorado Springs, for Amicus Curiae Nelson O. Kelm.

Gregory John Hock, P.C., Gregory John Hock, Colorado Springs, for Petitioner Mark Stephen Raimer.

Greg Van Culin, Colorado Springs, for Respondent Melissa Harte-Raimer.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari in *In re Marriage of Hunt*, 868 P.2d 1140 (Colo.App.1993), and in *In re Marriage of Raimer*, No. 92CA0759 (Colo.App. Aug. 5, 1993), to determine whether pension increments based on post-dissolution increases in rank are included in determining what portion of a military pension is subject to division as marital property. In both cases, the court of appeals affirmed the trial courts' deferred distribution of military pensions based on the "time rule" formula which includes distribution of benefits attributable to post-dissolution increases in rank. The petitioners, in both instances the husbands, petitioned the court to review the distributions. We issued a consolidated opinion on May 15, 1995, reversing judgment in both cases and remanding with directions. By order dated June 19, 1995, we granted the respondents' motions for rehearing and withdrew our previously issued opinion. After requesting and receiving additional briefs, we now affirm the court of appeals' decision in *Hunt* and approve the trial court's distribution in that case. We reverse the court of appeals' decision in *Raimer*. We find that the trial court in *Raimer* abused its discretion in altering the "time rule" formula.

## I.

### A. *In re Marriage of Hunt*

The petitioner, John Hunt (Husband), and the respondent, Dianna Hunt (Wife), were married in 1977 and divorced fourteen years later in 1991. During their marriage, Husband earned ten years of creditable service, of the required twenty years, towards retirement from the United States Air Force. At the time of their divorce, Husband had achieved the rank of Captain. In October 1991, the trial court entered permanent orders dividing the parties' property. The trial court deferred distribution of Husband's military pension and determined that Wife should receive fifty percent of 10/20 of his pension on an as-received basis at the time he retires. In effect, the trial court's ruling grants Wife a portion of Husband's pension based upon the rank he achieves at the time of retirement rather than his rank of Captain at the time of the divorce. Husband appealed that portion of the trial court's distribution.

The court of appeals affirmed the trial court's division noting that Husband's "limited view of the value of the retirement benefit earned during marriage will not result in an equitable distribution." *Hunt*, 868 P.2d at 1142. In so holding, the court of appeals cited authority for the proposition that advancements resulting in higher benefits are " 'developed and enhanced throughout the course of the parties' . . . years of marriage.' " *Id.* (quoting *Bullock v. Bullock*, 354 N.W.2d 904, 910 (N.D.1984)). The court of appeals also reaffirmed "the trial court's discretion to fashion an equitable division." *Hunt*, 868 P.2d at 1142.

### B. *In re Marriage of Raimer*

The petitioner, Mark Stephen Raimer (Husband), and the respondent, Melissa Harte–Raimer (Wife), received a decree of dissolution on November 6, 1990, thereby ending their sixteen-year marriage. At the time of divorce, Husband was a member of the military and held the position of Major. He had accumulated eighteen years and six months towards his retirement. Of those, fourteen years were accumulated during his marriage to Wife. The military pension was the only asset of any real value accumulated during the course of the marriage.

On July 1, 1991, the trial court initially awarded Wife twenty-five percent of Husband's pension attributable to the rank and longevity attained by Husband on the date of dissolution.[1] Thereafter, the trial court, on

---

1. In its comments from the bench, the trial court stated that:

 I think the Court will adopt the reserve jurisdiction [sic] method and the normal way of dealing with that would be in the Court's view to divide 14 years which is again approximate of military married life of these parties by 19 years which is what he had put in at the time of the decree, divide that by two and I come up with something like 37 percent for her. But I'm going to discount that for two reasons. One, her support was lukewarm at best. And, two, she has ended up with a bit more of the property.

Wife's motion to amend and clarify its judgment, amended its decision and accorded Wife forty percent of the marital fraction (fourteen years over the number of years of service when Husband retires) of the benefit on an as-received basis. The trial court explained that it used forty percent instead of fifty percent in allocating the marital portion of the pension because of what it deemed Wife's "lukewarm" support of Husband's military career.

The court of appeals denied Husband's appeal of the trial court's amended order, summarily invoking its decision in *Hunt. Raimer*, slip. op. at 5.

## II.

### A.

A trial court's distribution of property between spouses upon dissolution is controlled by the Uniform Dissolution of Marriage Act (the UDMA), §§ 14–10–101 to –133, 6B C.R.S. (1987 & 1995 Supp.), and, more specifically, the criteria enumerated in section 14–10–113, 6B C.R.S. (1987), which sets forth in relevant part that:

(1) In a proceeding for dissolution of marriage or in a proceeding for legal separation or in a proceeding for disposition of property following the previous dissolution of marriage by a court which at the time of the prior dissolution of the marriage lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall set apart to each spouse his property and shall divide the marital property, without regard to marital misconduct, in such proportions as the court deems just after considering all relevant factors including:

(a) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;

(b) The value of the property set apart to each spouse;

(c) The economic circumstances of each spouse at the time the division of prop-

erty is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and

(d) any increases or decreases in the value of separate property of the spouse during the marriage or the depletion of the separate property for marital purposes.

■ The UDMA establishes a two-part inquiry. Upon dissolution, a court first must determine whether an interest is "property." If so, the court next determines whether the property is "marital," *i.e.*, acquired during the marriage and subject to distribution, or "separate" and shielded from distribution.

■ The UDMA incorporates a presumption that any property acquired by a spouse subsequent to the marriage, regardless of the form of ownership, is marital property. § 14–10–113(3). Separate property is distinguished from marital property in section 14–10–113(2) which states that:

(2) For purposes of this article only, "marital property" means all property acquired by either spouse subsequent to the marriage except:

(a) Property acquired by gift, bequest, devise, or descent;

(b) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(c) Property acquired by a spouse after a decree of legal separation; and

(d) Property excluded by valid agreement of the parties.

Property is valued "as of the date of the decree or as of the date of the hearing on disposition of property if such hearing precedes the date of the decree." § 14–10–113(5).

### B.

■ Pension plans come in many complex varieties and forms, including vested or unvested pensions, matured or unmatured

---

The trial court termed its methodology "reserve jurisdiction" but it actually applied the deferred distribution method as that term is used in this opinion.

pensions, defined benefit or defined contribution pensions, contributory or noncontributory pensions, etc.[2] A military pension has certain unique attributes. A military pension is a defined benefit plan and is non-contributory in nature because only the employer contributes. In a military pension, an employee earns "credits" towards a pension based on, for example, years of active service. 10 U.S.C. § 1405 (1983). A military pension vests after twenty years of creditable service. There is no partial vesting; a member of the military must attain twenty years of service or forfeit the entire pension. 3 William M. Troyan et al., *Valuation & Distribution of Marital Property* § 46.32 (1995). Pension benefits are computed as a specific percentage of the active duty pay for the rank held at the date of retirement for each year of creditable service. 10 U.S.C. §§ 1406, 1407 (1983 & 1995 Supp.).

We have held that pension plans, including military pensions, are "property" under the UDMA and, if marital, are subject to division. *In re Marriage of Gallo*, 752 P.2d 47, 54 (Colo.1988) ("vested and matured military retirement pay, which has accrued during all or part of a marriage, constitutes marital property subject to equitable division in a dissolution proceeding"); *In re Marriage of Grubb*, 745 P.2d 661, 665 (Colo.1987) ("vested but unmatured employer-supported pension plan, to the extent that such plan has been funded by employee and/or employer contributions during the course of a marriage, is marital property subject to equitable distribution in a dissolution proceeding") (footnote omitted).

Here, we are faced with noncontributory defined benefit pension plans that are both unvested and unmatured. Such plans are affected by different contingencies from those considered in *Gallo* and *Grubb* in which the plans were vested. In particular, if a plan is not vested, the amount of the benefit is unknown: it can increase or decrease depending on a number of variables. Consequently, some courts that have permitted division of vested plans have held that unvested pension plans are not divisible because of the contingencies of such benefits.[3] Before we address the additional issues and concerns raised by such circumstances, we must review the different means at a trial court's disposal to effect distributions of pension plans.

### C.

Three methods of distribution are utilized by courts in order to divide a pension plan upon dissolution: (1) net present value;

---

**2.** Pension benefits vest, that is, the benefits are no longer subject to forfeiture even if the employee chooses to leave the employer, when the employee has been employed for a predetermined number of years. Brett R. Turner, *Equitable Distribution of Property* § 6.02 (2d ed.1994). Conversely, pension benefits are characterized as unvested or contingent when the employee has not met the required number of years to be assured the benefits. The benefits are forfeited if the employee dies, quits, or is fired.

Pension benefits mature when the employee reaches a certain age, typically called "retirement" age. If the plan is vested and matured, the employee is eligible to start receiving pension benefits (a pension, by definition, cannot be matured and unvested). A vested but not matured plan is contingent upon the employee's survival until the benefits mature. An unvested and unmatured plan is contingent upon the employee's continued employment and survival until the benefits mature.

If a plan is a defined benefit plan, the employee's benefits are computed either in advance or pursuant to a formula which contains variables such as, for example, length of service and the employee's highest monthly salary. *See* J. Thomas Oldham, *Divorce, Separation and the Distribution of Property* § 7.10[2] (1987 & 1995 Supp.). Upon retirement, the employee will receive that predetermined or formulary benefit.

A defined contribution plan is one in which both the employee and employer contribute a specified amount of money and the employee's benefits are expressed as a current balance in a pension account. *Id.* On retirement, the employee will receive the balance in the account maintained for that employee. Some pensions are noncontributory in that only the employer contributes. *Id.* Alternatively, in contributory plans, an employee funds all or some of the plan. Any funds contributed by the employee are by definition immediately vested. *Id.*

Unfortunately, courts and commentators have not consistently utilized the same pension terminology. As a result, the reader must scrutinize cases and articles carefully to avoid being misled by labels.

**3.** *See, e.g., Kirkman v. Kirkman*, 555 N.E.2d 1293, 1294 (Ind.1990) (holding that if pension benefits are not vested prior to dissolution the benefits should be excluded from property division).

(2) deferred distribution; (3) and reserve jurisdiction. Brett R. Turner, *Equitable Distribution of Property* § 6.11 (2d ed. 1994 & 1995 Supp.) (hereinafter "Turner"). We have recognized and approved all three methods. In *Grubb*, we discussed the net present value and deferred distribution methods and held out the possibility of other methods of distribution. *Grubb*, 745 P.2d at 666. Subsequently, in *Gallo*, we discussed more extensively the delayed methods of distribution.[4] *Gallo*, 752 P.2d at 55.

■ The first method, net present value, results in immediate distribution to the non-employee spouse. This method also is referred to as "immediate offset" because the lump sum that represents the net present value of the future benefit may be offset by the value of other property in the marital estate. If using this method, the trial court, guided by actuarial data, values the future benefit, considers a number of different factors, including certain risks (depending on the type of pension plan), and accords a present value to the future benefit. The net present value method is used most often when the value of the pension is low because the employee spouse has worked only a few qualifying years during the marriage, has held a low paying job, or both.

■ The remaining two methods, deferred distribution and reserve jurisdiction, the latter of which is also referred to as "wait and see," do not result in immediate offset and the nonemployee spouse does not receive any benefits until the benefits actually are paid to the employee spouse or the employee spouse becomes eligible to receive benefits.[5]

In deferred distribution, the trial court predetermines the percentage of the pension stream of income that the nonemployee spouse will be eligible to receive once the pension is both vested and matured. If the court reserves jurisdiction, the nonemployee spouse's percentage share is calculated later at the time when the pension has vested and matured.

Two of the three methods, net present value and deferred distribution, require the trial court to devise a formula or percentage by which to apportion the pension benefits. Here both trial courts used the deferred distribution method. That is, both courts determined in advance of the receipt of benefits what portion of those benefits the nonemployee spouse would be eligible to receive. Both courts based their allocation of the military pensions at issue on the "time rule" formula. The "time rule" formula includes a marital fraction, sometimes referred to as a "coverture fraction," which determines the marital interest in the pensions. The marital fraction consists of the numerator which is the number of years (or months if more accurate) that the employee spouse has earned towards the pension during the marriage, over the denominator, which is the number of years (or months if more accurate) of total service towards the pension. The marital fraction is multiplied times the monthly benefit and divided in half (in order to divide the marital portion of the pension benefits). At the time the court establishes the percentage, the benefit is an unknown figure. Therefore, actual calculation of a dollar amount must await receipt of benefits.

---

4. In *Gallo*, we described both delayed methods of distribution as reserve jurisdiction. *Gallo*, 752 P.2d at 55. We now differentiate between deferred distribution and reserve jurisdiction on the basis of whether or not a percentage is fixed in advance of distribution.

5. For example, the employee spouse may choose to continue to work beyond the time when he or she is eligible to receive the pension benefits. Receipt of such benefits is deferred until the employee spouse makes a unilateral decision to retire. This delay may frustrate the nonemployee spouse's needs and expectations and undercut the court's distribution plan. Some courts have held that the employee spouse should begin paying the nonemployee spouse as soon as the em-

ployee spouse is eligible to receive the pension benefits rather than when they actually are received. *See, e.g., Koelsch v. Koelsch*, 148 Ariz. 176, 713 P.2d 1234, 1241–43 (1986); *In re Marriage of Gillmore*, 29 Cal.3d 418, 174 Cal.Rptr. 493, 496–98, 629 P.2d 1, 4–5 (1981). In *In re Marriage of Blake*, 807 P.2d 1211, 1213–14 (Colo. App.1990), *cert. denied*, No. 91SC22 (Colo. March 25, 1991), the Colorado Court of Appeals relied on these decisions in affirming the trial court's order that the employee spouse pay to the nonemployee spouse her share of the pension on a monthly basis prior to the employee spouse's receipt of the benefits (a lump sum distribution was not feasible because there were insufficient assets in the marital estate with which to offset).

William M. Troyan, *Pension Evaluation and Equitable Distribution,* 10 Fam. Law Rep. (BNA) 3001, 3007 (1983). The formula is as follows:

$$\frac{\text{Years of Service During Marriage}}{\text{Years of Total Service}} \times \text{Monthly Benefit (After Taxes)} \times \tfrac{1}{2}$$

The "time rule" formula has been approved by a number of jurisdictions. *See, e.g., Cooper v. Cooper,* 167 Ariz. 482, 808 P.2d 1234, 1242 (Ct.App.1990), *review denied,* (Ariz. May 7, 1991); *In re Marriage of Freiberg,* 57 Cal.App.3d 304, 127 Cal.Rptr. 792, 796 (1976); *Stouffer v. Stouffer,* 10 Haw.App. 267, 867 P.2d 226, 231 (1994); *Warner v. Warner,* 651 So.2d 1339, 1340 (La.1995); *Lynch v. Lynch,* 665 S.W.2d 20, 23–24 (Mo. Ct.App.1983); *Rolfe v. Rolfe,* 234 Mont. 294, 766 P.2d 223, 226 (1988); *Gemma v. Gemma,* 105 Nev. 458, 778 P.2d 429, 431 (1989); *Berry v. Meadows,* 103 N.M. 761, 713 P.2d 1017, 1023 (Ct.App.1986); *Welder v. Welder,* 520 N.W.2d 813, 817 (N.D.1994); *Woodward v. Woodward,* 656 P.2d 431, 433–34 (Utah 1982).

### III.

### A.

The present disputes arose because application of the "time rule" formula necessarily includes post-dissolution pension enhancements.[6] Thus, the issue presented is whether, under the UDMA, enhanced pension benefits due to post-dissolution increases in rank are "acquired" during the marriage under section 14–10–113(2). Stated in practical terms, the question is whether a nonemployee spouse should be eligible to receive a percentage of the employee spouse's pension benefits on the basis of the rank held by the employee spouse on the date of dissolution or, alternatively, based on the rank held at the time the benefits are received.

■ In our view, this issue was implicitly decided in *Grubb* and *Gallo* when we authorized trial courts to delay distribution of pension benefits by use of the deferred distribution or reserve jurisdiction methods of allocating pension benefits. We now hold expressly that post-dissolution increases in pension benefits are marital property when the trial court, in the sound exercise of its discretion, divides the pension under either the deferred distribution or reserve jurisdiction method. The "economic partnership" in the pension necessarily continues between the parties and post-dissolution increases (or decreases) of the pension are marital property unless the nonemployee spouse is paid the net present value of his or her share of the pension at the time of dissolution.

### B.

The petitioners in both cases, however, assert that the trial court is statutorily constrained from dividing *separate* property, which is property acquired after the marriage. The petitioners seek implementation of a "bright line" rule which likens post-divorce pension enhancements to post-divorce earnings and characterizes all such increases as the separate property of the employee spouse.

■ Post-divorce earnings are indisputably separate property. *See* J. Thomas Oldham, *Divorce, Separation and the Distribution of Property* § 7–10[5] (1987 & 1995 Supp.) (hereinafter "Oldham"). Similarly, property acquired by a party after the dissolution is immunized from division. § 14–10–113(2)(c). We do not agree, however, that it follows that post-divorce pension enhancements are separate property under the same rationale.

Jurisdictions are split on this issue. There are two general lines of authority. One line of decisions adopts the "bright line" rule advocated by the petitioners here. The other line of decisions approves use of the "time rule" formula which incorporates distribution of post-marital pension enhancements. This second line of decisions, based on the "marital foundation" theory, has a more solid theoretical premise and is a sensible and fair approach.

---

6. The post-dissolution enhancements at issue pertain only to increases in rank, not passive increases such as cost-of-living increases. The petitioners in both cases concede that passive increases were properly apportioned to their spouses.

The "bright line" rule cases equate post-dissolution pension benefit enhancements with post-dissolution earnings. *See, e.g., Koelsch v. Koelsch,* 148 Ariz. 176, 713 P.2d 1234, 1239 (1986) (hereinafter *"Koelsch II"*) (holding that use of the "time rule" formula contravenes the notion that fruits of labor expended during marriage are community property whereas earnings after the marriage are separate property); *Shill v. Shill,* 115 Idaho 115, 765 P.2d 140, 143 (1988) (holding that the trial court impermissibly awarded increases in pension benefits accruing after divorce since such benefits are not "acquired during the marriage" and hence are separate); *Berrington v. Berrington,* 534 Pa. 393, 633 A.2d 589, 594 (1993) (holding that "in a deferred distribution of a defined benefit pension, the spouse not participating may not be awarded any portion of the participant-spouse's retirement benefits which are based on post-separation salary increases, incentive awards or years of service"); *Berry v. Berry,* 647 S.W.2d 945, 946 (Tex. 1983) (disapproving the "time rule" since it " 'has the effect of awarding benefits accruing to the [employee spouse] after the divorce from [the nonemployee spouse]' ") (quoting *In re Marriage of Rister,* 512 S.W.2d 72, 74 (Tex.Ct.App.1974)).

We decline to follow this line of decisional authority. We find that the "bright line" rule contravenes the principles underlying equitable distribution and unduly constrains trial courts from performing their statutorily prescribed duty under the UDMA. Furthermore, as noted above, its adoption would be contrary to our *Grubb* and *Gallo* decisions. In *Grubb,* we approved the use of the deferred method of distribution on a percentage basis noting that it allows both spouses to share in the incremental value of the pension while "equally apportioning any risk of forfeiture upon both parties to the dissolution proceeding." *Grubb,* 745 P.2d at 666.

Similarly, in *Gallo,* we approved the awarding of "the appropriate percentage of the marital interest in each payment 'if, as, and when, it is paid out' " in order to equally apportion the risk of forfeiture upon both parties. *Gallo,* 752 P.2d at 55 (quoting *Johnson v. Johnson,* 131 Ariz. 38, 638 P.2d 705, 708 (1981)).

## IV.

### A.

We agree with the rationale employed by those jurisdictions which reject the "bright line" rule and approve the use of the "time rule" formula under the "marital foundation" theory. *See, e.g., In re Marriage of Adams,* 64 Cal.App.3d 181, 134 Cal.Rptr. 298, 302 (1976) (holding that "[t]wo of the factors causing the increase, namely 'time on the job' and increased earnings, were directly enhanced by the many years credited to the marriage" ); *Stoerkel v. Stoerkel,* 711 S.W.2d 594, 597 (Mo.Ct.App.1986) (holding that "increased benefits arise in part from the service performed during the marriage and for that reason it is proper to make the award on the basis of the total amount which [the employee spouse] would receive at the time such benefits commence" ); *Lynch v. Lynch,* 665 S.W.2d 20, 24 (Mo.Ct.App.1983) (holding that "the higher retirement benefits that may be realized by the [employee spouse] by continued employment after the dissolution are made possible, in part, by [the employee spouse's] years of employment during the marriage"); *Gemma v. Gemma,* 105 Nev. 458, 778 P.2d 429, 431 (1989) (noting that "early working periods are the building blocks to upward mobility and hopefully an increased salary" and "[w]hile no method is perfect, the advantages of the 'time rule' clearly outweigh any other method of pension division" );[7] *Bullock v. Bullock,* 354 N.W.2d

---

7. In *Gemma,* the Nevada Supreme Court held out the possibility that a compelling situation requiring the opposite conclusion may occur "if the employee spouse attained an undergraduate or an advanced degree and received promotions with the same department, or transferred to an entirely new area of governmental service with an increased salary but remained within the coverage of the pension plan." *Gemma,* 778 P.2d at

431. In those instances, the court held that the employee spouse could request the court in advance to reserve jurisdiction and that this method "provide[s] a procedure to accommodate those relatively few cases where it would be inequitable for the nonemployee spouse to receive retirement benefits based upon a high salary level achieved by the employee spouse's post-

904, 910 (N.D.1984) (holding that the husband's "years of military service during the parties' marriage provided a basis for any future promotions and increases in pay for length of service to which he may become entitled" and his "military career and earning ability were developed and enhanced throughout the course of the parties' seventeen years of marriage"); *Bulicek v. Bulicek*, 59 Wash.App. 630, 800 P.2d 394, 399 (1990) (holding that "the prospective increase in retirement benefits due to increased pay after separation is founded on the [length of the marriage] years of community effort").

### B.

The "time rule" formula recognizes that post-divorce pension benefit enhancements defy easy categorization. Typically, there is commingling of effort undertaken during the marriage and after the marriage which together enhance the value of the future benefit. The employee spouse's ability to enhance the future benefit after the marriage frequently builds on foundation work and efforts undertaken during the marriage. Hence, the theory underlying the "time rule" formula is called the "marital foundation" theory. *See* Turner § 6.10 at 66 (2d ed. 1995 Supp.). We agree with the cases cited above that accept the "marital foundation" theory. Thus, we find that although sometimes related to effort, post-dissolution enhancement must be treated identically to passive increases such as cost-of-living increases or increases ascribable to pension plan changes in order to equitably apportion the risks of delay inherent in the deferred distribution and reserve jurisdiction methods for distribution of benefits.[8]

The length of the marriage is a significant consideration in distribution of marital property. Courts have recognized that the total number of years credited to the pension during the marriage is a substantial factor in the pension's distribution. *See Cooper v. Cooper*, 167 Ariz. 482, 808 P.2d 1234, 1242 (1990), *review denied*, (Ariz. May 7, 1991); *In re Marriage of Poppe*, 97 Cal.App.3d 1, 158 Cal.Rptr. 500, 503–04 (1979); *In re Marriage of Adams*, 64 Cal.App.3d 181, 134 Cal.Rptr. 298, 302 (1976). The length of the marriage during employment comes into play in two ways. First, it is relevant to the determination of the method by which the pension is divided. A short term marriage often permits immediate distribution of the pension under the present value method. Second, the marital fraction component of the "time rule" formula serves to fairly apportion the enhancement because it reflects the length of the marriage. Thus, the "time rule" formula alleviates concerns as to what portion of the enhancement is related to either the nonemployee's or employee's efforts during the marriage. If the employee spouse continues to work beyond the date on which he or she

---

marriage effort and achievement." *Id.*, 778 P.2d at 432.

Subsequently, in *Fondi v. Fondi*, 106 Nev. 856, 802 P.2d 1264 (1990), the Supreme Court of Nevada explained that the "usual" situation in which the "time rule" formula is appropriate, is "where the employee's wage increases were simply due to a rise in the cost of living, or a *gradual movement up the corporate ladder.*" *Id.*, 802 P.2d at 1266 (emphasis supplied).

The Supreme Court of Nevada's position has been characterized by one commentator as an intermediary position because it imposes a presumption that post-dissolution enhancements are marital. *See* Turner § 6.10 at 67 (2d ed. 1995 Supp.). The burden to overcome the presumption rests with the employee spouse who can come forward with evidence that the enhancements resulted from extraordinary post-dissolution efforts. *Id.* The *Gemma* analysis has been adopted by the Supreme Court of Louisiana in *Hare v. Hodgins*, 586 So.2d 118, 127–28 (La. 1991).

**8.** Turner has distinguished two theories pursuant to which courts have approved the use of the "time rule" formula. The predominant rationale is the "marital foundation" theory. Other courts, however, treat post-dissolution pension enhancements like passive appreciation of benefits that accrue during the marriage. Turner § 6.10 at 65–66 (2d ed. 1995 Supp.) (citing *Stouffer v. Stouffer*, 10 Haw.App. 267, 867 P.2d 226 (1994); *Barlow v. Barlow*, 116 N.C.App. 257, 447 S.E.2d 464 (1994); *Banagan v. Banagan*, 17 Va. App. 321, 437 S.E.2d 229 (1993)). Under this alternate rationale, the "time rule" formula separates the passive appreciation of marital property (benefits attributable to the marriage) from separate property. *Id.* By stating that post-dissolution enhancements should be treated in the same manner as the parties here have agreed to treat passive increases, we do not mean to suggest that we follow this alternate rationale. Rather, we agree with the cases adopting the "marital foundation" theory.

is eligible to receive pension benefits, and the trial court orders distribution as of the date of receipt of benefits rather than eligibility, the marital fraction adequately compensates and rewards the employee spouse for his or her continued efforts. This is so because the marital fraction is based on the length of the marriage during the years of employment (or military service) versus the employee spouse's total employment (or military service). As the employee spouse's total years of employment (or military service) increase, the nonemployee spouse's share of the pension necessarily decreases.

By logical extension, the "bright line" rule would require courts to attempt to parse out the "marital" portion of the post-dissolution enhancement from the "separate" portion, i.e., that portion attributable solely to the efforts of the employee spouse and not related to the marriage whatsoever. Implementation of the "time rule" formula, in the first instance, accomplishes that goal and removes courts from the complicated, time-consuming, inefficient, and hopelessly flawed task of evaluating the enhancement and denominating the enhancement as either marital, separate, passive, or some combination thereof. See Turner § 6.10 at 65 (2d ed. 1995 Supp.) (the time rule formula has the benefit of simplicity because "it avoids the need to draw messy distinctions between different types of postdivorce increases"). It is not appropriate for courts to delve into this sort of analysis for a number of reasons. Such inquiry would lead to widely divergent and inconsistent results, inject an element of fault into the property division, and enmesh the courts in the parties' lives for many years.

If we were to adopt a "bright line" rule, courts also would be required to consider the weight of the years of employment towards enhancement of the pension. Some defined benefit plans are "frontloaded" or "backloaded," i.e. "earlier or later years of employment

receive extra weight in the formula." Oldham § 7.10[5][c][iii] at 7–69. Therefore, depending on the plan, the earlier years of employment, occurring during the marriage, or the later years of employment, occurring post-dissolution, may have greater weight in contributing to the benefit. The "time rule" formula treats each year of employment equally. This unburdens trial courts from having to assess which years have more weight toward the accumulation of the benefit. Thereby, the "time rule" formula internalizes the notion that the highest salary realized by an employee is the product of all prior years and sensibly rejects the misconception that particular years of employment can be examined in a vacuum, like a snapshot in time, as under the "bright line" rule.[9]

Furthermore, we agree with the Supreme Court of Arkansas' analysis in *Askins v. Askins*, 288 Ark. 333, 704 S.W.2d 632 (1986). In *Askins*, the court acknowledged that "[t]he enhancement of the ultimate retirement pay may be most dramatic at the end" but nevertheless sanctioned the "time rule" formula because it could not hold that the wife's "contribution to the pension was any less because she was married to [the husband] in the middle of his career than it would have been had she been married to him for, say, the last twelve years of it." *Id.*, 704 S.W.2d at 634.

If the trial court decides to reserve jurisdiction over a future stream of income, the court can consider all the pertinent events that have transpired since the dissolution. The court also benefits from knowing the exact amount of the pension payout, which is already fixed. However, this certainty comes with a price. It prolongs the distribution process, increases legal costs, and undercuts goals of finality. Instead, a trial court may legitimately choose to defer distribution and apportion the benefits in advance by way

---

**9.** One commentator explained that courts that have adopted the "marital foundation" theory: have also noted that most retirement plans are end-loaded: if two employees do the same work for the same salary, and [sic] but one has more seniority than the other, the more senior employee often acquires more retirement benefits. This difference between the time at which employees perform services (generally earlier

in employment) and the time at which the resulting retirement benefits accrue (generally later in employment) has reinforced the belief of some courts that retirement benefits acquired after divorce are consideration for the employee's entire period of service and not just for service after the divorce.
Turner § 6.10 at 66 (2d ed. 1995 Supp.).

of a fixed percentage. *See Gallo,* 752 P.2d at 55 ( "Further resort to the courts can be ameliorated, however, by determining a formula or percentage by which the payments should be divided at the time of the dissolution decree." ); *Bulicek,* 800 P.2d at 399 (explaining that a fixed percentage award of pension benefits on an as-received basis should be encouraged because it "avoids difficult valuation problems, shares the risks inherent in deferred receipt of the income, and provides a source of income to both spouses at a time when there will likely be greater need for it" ). Consideration of changed circumstances under the reserve jurisdiction method is analogous to fixing the percentage share of each spouse in advance on an as-received basis.

 In both the deferred distribution and reserve jurisdiction methods, the nonemployee spouse must wait to receive his or her share of the pension. Consequently, as already discussed, receipt of the benefits is contingent upon a number of variables.[10] In *Grubb,* we noted that *"[a]ny contingencies underlying the actual commencement of retirement under a pension plan should be taken into account, not when determining whether the pension plan is properly includable in the marital estate, but, rather, when the court disposes of marital property between the parties." Grubb,* 745 P.2d at 665 (emphasis supplied). The same notion holds true where, as here, the contingency is not only survival, but also increase or decrease in value based on uncertain future events. This is particularly compelling since, for the most part, the risks, delay, and uncertainty of the receipt of pension benefits, are in the control of the employee spouse. If the nonemployee spouse must bear the risks attendant to waiting, then the nonemployee should share in the

increased benefits that accrue during the delay. *See Stouffer,* 867 P.2d at 232 (holding that "if the [nonemployee spouse] is required to wait after the divorce until the employed party retires before he or she receives the percentage of the employed party's retirement payments, then he or she should be awarded the percentage of all of the employed party's retirement payments if, as and when made"); *Rolfe,* 766 P.2d at 226 (recognizing that if distribution is deferred the nonemployee spouse stands to lose interest and should be compensated).

It is important to recognize that the "bright line" rule can lead to unfair and illogical results affecting not only the nonemployee spouse but also the employee spouse. For example, in addition to promotion, an employee spouse is subject to post-dissolution demotion. Demotion usually results in benefits that are lower than those the employee spouse would have been eligible to receive had he or she retired at the date of dissolution. Under the "bright line" approach, the employee spouse would still have to pay out a proportion of pension benefits that the nonemployee spouse would have been eligible to receive had the employee spouse retired on the date of dissolution even though the anticipated amount was not forthcoming. We find that it is appropriate for the nonemployee spouse to share in the contingency of loss as well as the contingency of gain.

In so holding, we explicitly reject the reasoning employed by the Arizona Supreme Court in *Koelsch II,* 148 Ariz. 176, 713 P.2d 1234. In *Koelsch II,* the husband at the time of the decree was six months away from eligibility for retirement. He chose to con-

---

10. The contingencies include the following events:
 1. Spouse terminates, withdraws benefits, and does not reinstate [benefits].
 2. Spouse terminates, withdraws benefits, and subsequently does reinstate upon reemployment.
 3. Spouse terminates, does not withdraw benefits, and leaves as matured.
 4. Other spouse dies before spouse has either elected to terminate or retire.
 5. Other spouse dies after retirement but before spouse.

 6. Spouse dies before retirement.
 7. Spouse dies after retirement but before other spouse.
 8. Significant changes are made by the [employer] after divorce and before retirement in the accrual of benefits.
 9. Significant changes are made by the [employer] after retirement in the level of benefit payments.
Turner § 6.11 at 351 (2d ed.1994) (footnote omitted) (citing *Broadhead v. Broadhead,* 737 P.2d .731, 736 n. 5 (Wyo.1987)).

tinue working and delay receipt of benefits which would result in increased benefits when he ultimately retired. The lower court applied the "time rule" formula and deferred compensation until the husband began to receive his benefits reasoning that:

> In such a case, in consideration of the one spouse foregoing the present enjoyment of the benefits, he or she will share in any increase in benefits that continued employment will produce, including increase in pension benefits and salary. The covered spouse who now has complete control of the time when benefits will be received may continue to work and reap the rewards thereof, but does so with the knowledge that the ex-spouse's interest in retirement benefits is fixed and that he or she will share in what the continued employment will produce.

*Koelsch II,* 713 P.2d at 1237 (quoting *Koelsch,* 148 Ariz. 187, 713 P.2d 1245, 1249 (Ariz.Ct.App.1984) (*Koelsch I* )).

The Supreme Court of Arizona unequivocally rejected the court of appeals' reasoning:

> The court of appeals attempted to ameliorate the risk of loss faced by the nonemployee spouse by devising a formula which would permit that spouse to share in the future increases in the pension benefits. This compromise is improper for several reasons. First, it improperly allows the non-employee spouse to share in the post-dissolution separate property earnings of the employee-spouse. *Since the non-employee spouse cannot legally share in the prospective benefits of the delayed retirement, he or she should not be forced to share in the potential risks of such a venture. The non-employee spouse should not be made to be an involuntary investor in an ex-spouse's pension plan.*

*Koelsch II,* 713 P.2d at 1239–40 (emphasis supplied). While the underscored statements have some surface appeal, they ignore the fact that the economic circumstances of many marriages do not permit an immediate distribution of the pension's present value. The nonemployee spouse often remains an "involuntary investor" who should be compensated fairly.

### C.

▬ The *Koelsch II* decision is cited frequently for the very proposition we now reject.[11] First, we hold that post-dissolution enhancements are not categorically separate but rather are marital. Second, we hold that a nonemployee spouse *should* be compensated for risk of forfeiture, delay in receipt, and lack of control over the timing of receipt of benefits. An appropriate way to compensate the nonemployee spouse is to permit him or her to share in post-dissolution enhancements. This serves to achieve a balance between, on the one hand, the employee's unilateral control in decision making, and on the other, the nonemployee's interest in the pension. Likewise, if the nonemployee spouse shares in beneficial contingencies, the nonemployee spouse also should share in the risks of post-dissolution pension decreases.

Moreover, if the parties each have a continuing interest in the pension that extends beyond the marriage, the "economic partnership" forged during the marriage in effect survives the marriage. Thus, it is particularly appropriate that both parties share in the risks, both beneficial and detrimental, associated with delayed distribution.

▬ The trial court has great latitude to effect an equitable distribution based upon the facts and circumstances of each case. § 14–10–113(1), 6B C.R.S.· (1987); *see also Radigan v. Radigan,* 465 N.W.2d 483, 487 (S.D.1991); *Bullock,* 354 N.W.2d at 910; *Bulicek,* 800 P.2d at 396. Certainly the underlying purposes of equitable distribution and equity in general preclude courts from blind application of rigid categories. We have explained that "[t]he key to an equita-

---

11. Subsequently, in *Cooper v. Cooper,* 167 Ariz. 482, 808 P.2d 1234 (1990), *review denied,* (Ariz. May 7, 1991), an Arizona appellate court interpreted and distinguished the Arizona Supreme Court's decision in *Koelsch II* because the "blanket statement" that any and all post-dissolution increases are separate property "fails to account for the differences in benefit plans, i.e., defined contribution versus defined benefit." *Id.,* 713 P.2d at 1241. Although we disagree with the reasoning employed by the Arizona Supreme Court in *Koelsch II,* we find that the military pensions before us here are akin to the pension plan in *Cooper,* a defined benefit plan, rather than that in *Koelsch II,* a defined benefit plan requiring employee contributions.

ble distribution is *fairness*, not mathematical precision." *Gallo*, 752 P.2d at 55 (emphasis supplied). In shaping a fair and equitable distribution, the trial court considers numerous factors in a totality-of-the-circumstances analysis. It would be wrong to permit the trial court to weigh and balance the many competing considerations with respect to property division and then impose a "bright line" test with respect to enhanced pension benefits. This is particularly true because pension benefits are often the only important asset in the marital estate. *See* Oldham § 7–10[1] at 7–41 ("Pension rights frequently represent a significant portion of the aggregate value of the marital estate."). Accordingly, there is a premium in such situations on flexibility.

■ On review, an appellate court must not disturb the delicate balance achieved by the trial court in division of property. The trial court is best-situated to render the distribution in the first instance, and its decision should not be disturbed on appeal unless there has been a clear abuse of discretion. Further, shifting the trial court's distribution may skew the delicate balance achieved by the trial court's distribution. This is reflected in the abuse of discretion standard of review.

### D.

In construing the UDMA, we are guided by section 14–10–104(1), 6B C.R.S. (1987), which states that "[t]his article [the UDMA] shall be so applied and construed as to effectuate its general purpose to make uniform the law with respect to the subject of this article among those states which enact it." We have previously recognized this legislative mandate. *In re Marriage of Wells*, 850 P.2d 694 (Colo.1993). Statutes analogous to the UDMA have been codified by seven other states. Of these seven states, four have recognized that a trial court should be afforded considerable discretion in dividing marital assets.[12]

Although not a state that has codified the UDMA, California courts have long propounded a similar rationale for permitting division of post-dissolution pension enhancements by application of the "time rule." In *Adams*, 134 Cal.Rptr. at 302, the court explained its position as such:

"As a general rule, in selecting a method to effect distribution of the community interest in retirement rights the court acts in the exercise of judicial discretion and its determination respecting such will not be interfered with on appeal unless an abuse of discretion is shown. *The criterion governing judicial actions is reasonableness under the circumstances. The method adopted may vary with the facts in each case.*"

*Id.* (emphasis supplied by *Adams*) (quoting *In re Marriage of Freiberg*, 57 Cal.App.3d

---

**12.** The seven other states that have adopted statutes based on the Uniform Marriage and Divorce Act (on which the UDMA is based) are Arizona, Illinois, Kentucky, Minnesota, Missouri, Montana, and Washington. *Wells*, 850 P.2d at 696 n. 3 (citing Uniform Marriage and Divorce Act, 9A U.L.A. (1987 & 1992 Supp.)). Of these, Arizona, Missouri, Montana, and Washington have recognized that the trial court is afforded considerable discretion in dividing marital assets and have held in favor of the nonemployee spouse in cases similar to the ones before this court. *See Cooper*, 167 Ariz. 482, 808 P.2d 1234; *Stoerkel*, 711 S.W.2d 594; *Rolfe*, 234 Mont. 294, 766 P.2d 223; *Bulicek*, 59 Wash.App. 630, 800 P.2d 394.

Of the remaining three states, we acknowledge that Minnesota has adopted the opposite approach. *See Petschel v. Petschel*, 406 N.W.2d 604, 607 (Minn.Ct.App.1987) (approving a fixed percentage approach but noting that future salary increases are a "legitimate concern" so that "the [employee spouse] may present evidence showing what part of the post-dissolution salary increases are attributable solely to [the employee spouse's] own efforts, such as increments resulting from promotions" which may be excluded). Illinois has conflicting case law on this issue. *Compare In re Marriage of Alshouse*, 255 Ill. App.3d 960, 194 Ill.Dec. 394, 396, 627 N.E.2d 731, 733 (1994) (holding that the trial court did not abuse its discretion in using the "time rule" formula over the employee spouse's objections that the formula does not grant the employee spouse the benefit of "additional years worked, the increases in earning occurring after the dissolution, and the changes in the pension plan, all of which contributed to the increased value of the pension"), *appeal denied*, 156 Ill.2d 555, 202 Ill.Dec. 918, 638 N.E.2d 1112 (1994) *with In re Marriage of Blackston*, 258 Ill.App.3d 401, 196 Ill.Dec. 606, 630 N.E.2d 541 (1994) (holding that the trial court erred in granting the nonemployee a portion of benefits that accrued post-dissolution and making no mention of the prior contrary decision reached in *Alshouse*). Kentucky does not seem to have considered this issue.

304, 127 Cal.Rptr. 792, 798 (1976)). Guided by this flexible standard, the California Court of Appeal found that the trial court did not abuse its discretion in using the date of retirement when apportioning retirement benefits. In so holding, the court gave weight to the fact that the marriage lasted twenty-one years and seven months and ended shortly before the pension was distributed. *Adams,* 134 Cal.Rptr. at 302.

Other jurisdictions have also accorded great deference to the trial court. *See, e.g., In re Marriage of Johnsrud,* 181 Mont. 544, 572 P.2d 902, 905 (1977) ( "The [trial court] need not be hamstrung in devising methods to accomplish an equitable division of property." ); *Turner v. Turner,* 649 P.2d 6 (Utah 1982) (refusing to modify a trial court's equitable distribution unless clearly unjust or clear abuse of discretion).

### V.

Synthesizing the decisions rejecting the "bright line" rule, we set forth the following guidelines for a trial court faced with a pension which accumulated in part during the marriage. We recognize that in certain cases post-dissolution increases in a pension should be treated as separate property. However, a pension qualifies for separate property treatment of post-dissolution increases only if the trial court can award the pension under the net present value theory at the time of dissolution. If the value of the pension cannot be divided at the time of dissolution but must be divided when it is received or could be received, then post-dissolution increases are marital property under the "marital foundation" theory. Treat-

ment of post-dissolution pension enhancements ultimately turns on the method of distribution employed by the trial court, which is driven by the particular circumstances of the marriage. A trial court's discretion lies in determining which of the three methods to use in apportioning the pension. The treatment of post-dissolution enhancements flows from this determination.

The benefits associated with immediate distribution are particularly compelling in those instances where the value of the pension benefits is minimal relative to the marital estate. A division of pension benefits on a net present value basis at the time of dissolution is appropriate, for example, in those cases where the value of the pension is small because the employee spouse has worked relatively few qualifying years during the marriage or the employee spouse earned a relatively low rate of pay.[13] This method also may be appropriate if both spouses have parallel careers and their pension benefits are of near-equal value.

If circumstances permit, and the trial court opts to use the net present value method, the nonemployee spouse exchanges future contingent post-dissolution enhancements for the benefits of immediate distribution. At the same time, the employee spouse reaps the benefit of potential enhancements that occur post-dissolution.[14] In practical effect, the use of the net present value method avoids the very issues raised in the cases presently before us. This is so because, among other things, the net present value calculation is based upon the employee spouse's salary at the time of divorce.[15] *See*

13. For example, in *Raimer,* the trial court appropriately awarded Wife's pension, pursuant to which she is eligible to receive $68 a month at the age of 65, entirely to her, and offset the value of the pension against other property in the marital estate.

14. In addition, if the employee spouse foresees that his or her extraordinary efforts will dramatically increase the value of the pension after the marriage, that spouse may have an incentive to "cash out" the interest of the nonemployee spouse. Under such circumstances, each spouse stands to benefit.

15. In particular,

[i]n order to reduce a pension to present value, it is necessary to know (1) the amount of the monthly benefits subject to division, (2) the percentage of that benefit to be awarded to the nonemployee spouse, and (3) when that benefit would begin payment. Where it cannot be known what these variables will be until the employee spouse actually retires and begins to receive retirement benefits, it is unnecessary, indeed improper, to wait until the employee spouse actually retires and use the actual amounts received by the employee spouse. Rather, the amount of the pension benefits can, and should, be determined at the time of divorce based upon three assumptions: (1) that the employee spouse would retire at the

1 John Tingley & Nicholas B. Svalina, *Marital Property Law* § 10.08 at 83 (2d ed.1995).

Distribution of net present value serves goals of finality. It allows the parties to disentangle themselves financially and provides some measure of closure. *See Moore v. Moore*, 114 N.J. 147, 553 A.2d 20, 26 (1989) ("The goal of divorce proceedings is to eliminate possible contact and strife between the parties."); *Shill*, 765 P.2d at 145 ("such solution would have the merit of disentangling the parties and their affairs at a finite point in time"). Immediate offset also fosters judicial efficiency. *Koelsch II*, 713 P.2d at 1241. It is more economical for the parties because they do not have to return to the courts at a later date. A number of other jurisdictions have stated a general preference for the net present value method for similar reasons. *See, e.g., Diffenderfer v. Diffenderfer*, 491 So.2d 265 (Fla.1986); *Dewan v. Dewan*, 399 Mass. 754, 506 N.E.2d 879 (1987).

■ If, however, the circumstances do not warrant immediate distribution because there are insufficient assets in the estate to permit offset, or the present value of the future benefit is too difficult to ascertain, the trial court may find it necessary to utilize either the deferred distribution or the reserve jurisdiction method. *See, e.g., Gallo*, 752 P.2d at 55; *In re Marriage of Nelson*, 746 P.2d 1346, 1349 (Colo.1987). Use of either of these methods increases the risks to the nonemployee spouse and entails differing levels of continued interaction between the parties and with the court.[16] In consideration of the increased risks and the continued "economic partnership" between the parties under either of the delayed methods of distribution, post-dissolution enhancements always must be treated as marital property if distribution is delayed.

■ In determining the method of distribution, the trial court balances the parties' interests in effecting a distribution of marital property under the UDMA. Relevant factors under the UDMA include the contributions of each spouse to the acquisition of property, including contributions of a homemaker, the value of the property set apart to each spouse, and the economic circumstances of each spouse. § 14–10–113(1). Among other things, balancing of the parties' interests will help the trial court assess which method of pension distribution is best suited for the particular circumstances. For example, the trial court can weigh the value of the pension benefits relative to the marital estate and ascertain whether immediate offset, if possible, is appropriate under the circumstances. Alternatively, the trial court may reach a conclusion that both parties should share equally in the contingencies presented by an unvested and unmatured plan. The trial court, in advance of distribution, may calculate the percentage share of each spouse in the pension.

■ The choice of a distribution method lies within the sound discretion of the trial court. Like the Supreme Court of Oklahoma, we hesitate "to dictate any specific technique for distributing pension benefits in a divorce because each pension plan presents a different set of problems." *Pulliam v. Pulliam*, 796 P.2d 623, 626 (Okl.1990). We have accorded trial courts substantial leeway in determining which method of distribution best suits the needs and financial circumstances of the parties. *See Grubb*, 745 P.2d at 665 ("Our intent here is not to create inflexible rules of property valuation."). Allowance of such trial court flexibility serves the goals of equitable distribution. *See* Colbey Campbell, *Distribution of Pension Benefits in Marital Dissolutions: Determining the Time of Evaluation of the Community Property Interest*, 24 Santa Clara L.Rev. 999, 999 (1984) (noting that because of the difference in composition of pension plans "courts use various methods of apportionment to as-

---

earliest date permitted under the plan; (2) that the pension is based upon the employee spouse's salary at the time of divorce; and (3) that the pension is based upon the number of years of credited service earned up to the date of divorce.

1 John Tingley & Nicholas B. Svalina, *Marital Property Law* § 10.08 at 82–83 (2d ed.1995).

16. We note that of the two remaining methods, the advantages of deferred distribution outweigh those of reserve jurisdiction. *See* discussion *supra* at p. 535; *see also Gallo*, 752 P.2d at 55.

certain a spouse's interest in retirement benefits in an attempt to distribute funds equitably"). The guidelines we set forth here retain the essential element of trial court flexibility while providing some guidance for trial courts to rely upon when confronted with a pension plan.

Having concluded that post-dissolution enhancements of pension benefits are marital property if distribution of the benefit is delayed, we now consider whether the trial courts nonetheless abused their discretion in the cases before us.

## VI.

Here, the *Hunt* court considered the relevant factors and effected distribution based on the equities. The court ruled that the nonemployee spouse should share in the pension at the time of retirement because of the length of their marriage and her efforts during the marriage. The *Raimer* court similarly considered the length of the marriage in ruling that the nonemployee spouse could share in the pension at the time of retirement. The *Raimer* court, however, misapplied the "time rule" formula. Accordingly, we find that the *Raimer* court abused its discretion.

### A. *In re Marriage of Hunt*

The trial court in *Hunt* orally held:

> With regard to the military retirement, I don't have any question in my mind that [Wife] is entitled—entitled to a share of that military retirement should—should [Husband] retire. I think that the 10–year figure is a good figure. I understand that we are talking about a 14–year marriage. And I understand that—that in most circumstances that [Husband] would be—or [Wife] would be entitled to that calculation which would include the whole 14 years. It's not part of the retirement, as I understand it. It's—the time that [Husband] took out in order to attend medical school is a—disallowed—[dis]allowed time, as I understand it, from the testimony here. And I'm not going to order that the retirement be calculated on that disallowed time.

> Obviously, it's something I consider. It's something I consider that—that the parties were married during that time, as I started to say, and it's certainly something I'm going to consider when I determine the proper amount of maintenance here, but the proper calculation, should [Husband] retire from the military service, is the 10—the 10 years of marriage over the amount of military service time, 20 probably or perhaps longer if [Husband] stays in longer, and then divide it, of course, by— or takes it times 50 percent payable to [Wife] as her share of [Husband's] military retirement.

The *Hunt* court also ruled in its written order:

> The court believes that [Husband's] military retirement is an asset which must be divided by the court. The court finds that [Husband's] figure of ten years is a correct and reasonable figure. Although the court finds that this is a marriage of almost fourteen years, the court recognizes that there have been only ten years of military service attributable and creditable toward retirement. As a result, should [Husband] retire, the numerator for any division of any military retirement shall be ten over the number of years in service whatever those may be. [Husband's] proposal for division of this asset as an asset of the marriage using a present value calculation is not convincing. The court does not find that the present value calculation made by [Husband] follows any generally accepted accounting standards. The court does find that military retirement benefit shall be divided using the fractions noted above based upon [Husband's] rank at the time of retirement. [Husband] has argued that a calculation should be based upon [Husband's] rank at the time of divorce. The court finds no authority for this position.

█ The factual circumstances demonstrate that the Hunt court did not abuse its discretion in making an equitable distribution.

### B. *In re Marriage of Raimer*

The trial court in *Raimer* initially made the following oral ruling:

As to the other property, what we're really dealing with here is the military pension. And I think the Court will adopt the reserve jurisdiction [sic] method and the normal way of dealing with that would be in the Court's view to divide 14 years which is again approximate of military married life of these parties by 19 years which is what he had put in at the time of the decree, divide that by two and I come up with something like 37 percent for her. But I'm going to discount that for two reasons. One, her support was lukewarm at best. And, two, she has ended up with a bit more of the property. So, I'm going to order that she receive 25 percent of the military retirement benefit and order Survivor's Benefit Plan if, as you say, Mr. Van Culin [Wife's attorney], that's possible. I think it is. But that she has to pay for that plan out of her share of the retirement. So that's the way we'll work that. I think that's a fair share for her under the circumstances. She did not support fully the military career for a while.

[Husband] himself said when he was a lieutenant or captain, she did. And it's after that she didn't. So coupled with her getting more of the property and coupled with her lack of support, although it didn't hurt his career toward the end, I think that's a fair allocation and that's what I will order.

Subsequently, the trial court in *Raimer* amended its ruling and stated that:

The reserve jurisdiction [sic] method of dividing the military retirement is appropriate under these circumstances. The share should be calculated as follows based upon the Court's earlier finding that the parties had been married during the 14 years of [Husband's] military career. The formula for [Wife's] share of the military retirement should be the benefit when received by the [Husband] multiplied times the coverture faction times 40 percent.

The Court has reduced the percentage from 50 to 40 for reasons earlier stated on the record. The coverture fraction is a fraction with the numerator of 14 and a denominator equal to the number of years of service at the time when [Husband] retires.

■ Although we find that the *Raimer* trial court did not abuse its discretion in deferring distribution [17] and utilizing the "time rule" formula, we find that the court nevertheless abused its discretion in altering the formula and according Wife forty percent of the marital portion of the pension instead of fifty percent.

Initially, we note that the *Raimer* court inappropriately interjected marital fault considerations into the distribution analysis. The determination of the parties' contributions to the acquisition of marital property cannot assess marital fault in any way. *See* § 14–10–113.

We recognize, however, that some authorities permit consideration of "economic fault" as distinguished from "marital fault" in the division of marital property. *See* Turner § 8.09 at 600 (2d ed.1994). Although not using the term "economic fault," we relied on a similar concept in a case arising before the adoption of the UDMA. *Liggett v. Liggett*, 152 Colo. 110, 380 P.2d 673 (1963).

"Economic fault" is a limited concept which comes into play only in extreme cases such as the spouse's dissipation of marital assets in the contemplation of divorce.[18] *See, e.g., In re Marriage of Ebel*, 874 P.2d 406 (Colo. App.1993) (approving trial court's distribution of fifty-six percent of marital assets to wife and forty-four percent to husband because husband had unilaterally withdrawn assets from their jointly owned golf course), *cert. denied*, No. 94SC44 (Colo. May 23, 1994). Given the UDMA's prohibition against consideration of "marital fault," it is

---

17. Under the terminology used in this opinion, the trial court mistakenly called its methodology "reserve jurisdiction." *See supra* note 1.

18. Some economic fault cases have arisen involving dissipation of pension assets. *See, e.g., In re Marriage of Malters*, 133 Ill.App.3d 168, 88 Ill. Dec. 460, 478 N.E.2d 1068 (1985) (husband

"borrowed" $900,000 against two pensions from his medical corporation). We leave for another day the question whether deferred distribution of the pension would be appropriate in such a case. The case before us here does not involve dissipation of pension assets.

especially important that "economic fault" be strictly confined so that it does not become a means to circumvent that prohibition. The *Liggett* case illustrates the inherent problems in distinguishing between "marital fault" and "economic fault." In that case, we upheld the trial court's refusal to award any marital property to the wife. In part, *Liggett* involved the wife's dissipation of marital assets since she failed to apply some $12,000 toward the payment of a hotel mortgage resulting in the loss of the property through foreclosure. *Liggett*, 152 Colo. at 112, 380 P.2d at 674. However, this court's rationale for upholding the award of all marital property to the husband is indistinguishable from a finding of marital fault:

> [W]here, as here, the court found that the wife failed during the entire period of the marriage relationship to perform her duties as a wife and a partner in the marriage relationship and did not contribute to the business or financial resources of the parties, but by her addiction and conduct constituted a drain upon the husband to his embarrassment and detriment, we cannot say as a matter of law that she is entitled to a division of property.

*Id.* at 113, 380 P.2d at 675. This finding could not be upheld under the UDMA and *Liggett* must be limited to pre-UDMA cases.

The facts in *Raimer* do not support a conclusion of "economic fault." Wife initially supported Husband's military career but encouraged him to leave the military which he did. After a short time in civilian life, Husband returned to the military with Wife's approval. The trial court found that Wife's attitude "didn't hurt [Husband's] career toward the end." This is not the kind of misconduct equivalent to the dissipation of marital assets which will support a finding of "economic fault."

Second, even if "economic fault" had been found, modification of the "time rule" formula for deferred distribution of the pension would be improper. If the "time rule" formula is used, the formula cannot be altered. As we explained above, the "time rule" formula inherently accounts for various considerations and serves to simplify the trial court's task. Alteration of the formula undermines the integrity of the formula and detracts from its very purpose.

If the multiplier representing the parties' shares (1/2 or fifty percent) is adjusted up or down as it was in this case, the method of distributing the pension becomes a hybrid. That is, part of the pension is distributed immediately by discounting one spouse's share and augmenting the other spouse's share because of the finding of "economic fault." The remainder of the pension, however, is paid out under deferred distribution "'if, as, and when'" it is received. *Gallo*, 752 P.2d at 55 (quoting *Johnson v. Johnson*, 131 Ariz. 38, 638 P.2d 705, 708 (1981)). Husband has proposed no rational way to quantify the two parts of this hybrid pension division and we know of none.

This lack of any sound theoretical basis for a hybrid distribution leads us to the final reason for rejecting the *Raimer* trial court's discounting of the share of the nonemployee spouse: it is wholly arbitrary and subjective. The ten percent discount imposed by the trial court has no basis in the evidence and was selected apparently as some form of rough justice to penalize the nonemployee spouse for what the trial court viewed as her lackluster interest in one phase of her husband's military career. Penalizing the nonemployee spouse, of course, has the direct effect of awarding a bonus to the employee spouse by increasing his share of the pension.

We could approve the trial court's action only if we were prepared to endorse its logical corollary which would allow the trial court to penalize the employee spouse in an appropriate case for showing insufficient interest or effort in the promotion of his or her career. Implementation of the trial court's theory would invite a nonemployee spouse to assert that the employee spouse owed his or her present rank and future bright prospects to the nonemployee spouse's good influence or efforts. Conversely, the nonemployee spouse could claim that the employee spouse should receive a discounted share of the pension because the employee spouse would have obtained a higher rank if he or she had worked harder. We conclude that determi-

nation of such imponderables is beyond the scope of permissible trial court inquiry.

Accordingly, we remand *Raimer* to the court of appeals with directions to the trial court to apply the "time rule" formula in its pure form and to recalculate the overall property distribution as may be appropriate.

## VII.

For the foregoing reasons, we hold that neither trial court abused its discretion in deferring distribution of the petitioners' military pensions and fixing the nonemployee spouses' shares on an as-received basis pursuant to the "time rule" formula. However, we find that the *Raimer* court abused its discretion in altering the "time rule" formula. We affirm the court of appeals' decision upholding the trial court's distribution in *Hunt* and reverse the court of appeals' decision in *Raimer*. We remand *Raimer* with directions that the "time rule" formula be applied in its appropriate form.

LOHR, J., concurs in part and dissents in part.

ERICKSON, J., dissents.

Justice LOHR concurring in part and dissenting in part:

These cases present an issue concerning the division of military pension benefits in a dissolution of marriage proceeding. The formula adopted by the majority for the determination of the portion of such benefits to be classified as marital property and for division of that marital property between the spouses under the deferred distribution method employed by the trial court in each case is as follows:

$$\frac{\text{Years of Service During Marriage}}{\text{Years of Total Service}} \times \text{Monthly Benefit (After Taxes)} \times \frac{1}{2}$$

Maj. op. at 532. By applying this formula, known as the "time rule" formula, a trial court effects both the determination of the portion of the pension benefit that is marital property (the product of the first two components of the formula) and the division of that marital property equally between the spouses (by multiplying the marital property por-

tion of the pension benefit times the third formula component, i.e., the 1/2 multiplier). I concur with the majority's adoption of the first two components of the formula to identify the marital property. I also agree with the conclusion, reflected in those components, that post-dissolution pension benefit enhancements are to be treated as marital property. However, because the division of marital property between the spouses is within the discretion of the trial court, I conclude that the trial court must be allowed discretion to adjust the 1/2 multiplier, the component of the formula that divides the marital portion of the pension between the spouses, if an evaluation of the factors mandated for consideration under section 14–10–113(1)(a)–(d), 6B C.R.S. (1987), requires such an adjustment. I would hold that the trial courts in both *In re Marriage of Hunt*, 868 P.2d 1140 (Colo.App.1993), and *In re Marriage of Raimer*, No. 92CA0759 (Colo App. Aug. 5, 1993), properly identified the marital property and acted within their discretion in dividing the property between the spouses. Accordingly, I agree with the majority that the judgment of the Colorado Court of Appeals upholding the trial court's division of military pension benefits in *Hunt* should be affirmed, but dissent from the majority's reversal of the court of appeals' affirmance of the trial court's division of such benefits in *Raimer*.

## I.

Under the Uniform Dissolution of Marriage Act (UDMA), §§ 14–10–101 to –133, 6B C.R.S.(1987 & 1995 Supp.), the trial court is charged with the task of dividing property between the spouses following the dissolution of a marriage. The distribution process is conducted in two steps. First, the trial court must classify the property as separate or marital. Second, the court must divide the marital property equitably between the spouses pursuant to the factors set forth in the UDMA. I agree in general with Justice Erickson that these two steps are undertaken pursuant to different legal standards. Erickson, J, dissenting op. at 549. The classification of an asset as marital property is typically a legal determination to be made

without discretion by the trial court pursuant to applicable law. *But see infra* at 528 n. 1. The division of the marital property is committed to the discretion of the trial court to be exercised in accordance with the criteria listed in section 14–10–113(1)(a).(d). The "time rule" formula adopted by the majority combines the classification and division steps into a single process that impermissibly eliminates all discretion of the trial court with respect to the division of the marital share of the military pension benefits.

### A.

Under the "time rule" formula, the share of the military pension benefits that is eligible to be divided by the trial court as marital property is computed by multiplying the first two components of the formula. Use of the "time rule" formula results in the inclusion of post-dissolution pension benefit enhancements within the marital estate, for the "monthly benefit" component of the formula is the actual monthly benefit received upon retirement. *See* maj. op. at 532. I agree with the majority that such a result is proper for precedential and policy reasons. Accordingly, I concur in the majority's adoption of the "time rule" formula for determining the marital share of military pension benefits when dividing such benefits under the deferred distribution method.

### B.

I do not agree, however, with the majority's adoption and application of the third component of the "time rule" formula. Following the calculation of the share of the military pension benefits that is marital property, the formula requires multiplication of this marital share by 1/2. This mandatory multiplication by 1/2 necessarily results in the equal division between the spouses of the marital share of the pension benefits. The majority holds that a trial court that elects to use the "time rule" formula has no discretion to alter this equal division of the marital portion of the pension benefits. Maj. op. at 543. I consider the majority's requirement of equal division to be an impermissible limitation on the discretion of the trial court to

fashion an equitable distribution of marital property.

Following dissolution of a marriage, the trial court effects division of property between the spouses pursuant to the UDMA. Specifically, section 14–10–113(1), 6B C.R.S.(1987), requires the trial court to:

> divide the marital property, without regard to marital misconduct, in such proportions as the court deems just after considering all relevant factors including:
>
> (a) The contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker;
>
> (b) The value of the property set apart to each spouse;
>
> (c) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children; and
>
> (d) Any increases or decreases in the value of the separate property of the spouse during the marriage or the depletion of the separate property for marital purposes.

Under this statutory scheme, a trial court must consider the criteria specifically identified in section 14–10–113(1)(a)–(d), including the contribution of each spouse to the acquisition of marital property. Implicit in the consideration of positive contributions to the marital estate is the equal relevance of negative contributions. Brett R. Turner, *Equitable Distribution of Property* § 8.05, at 575–76 & n. 105 (2d ed.1994). In its evaluation of the statutory factors, however, the trial court has broad discretion to fashion an equitable disposition of the property. *In re Marriage of Gallo,* 752 P.2d 47, 54 (Colo.1988); *In re Marriage of Price,* 727 P.2d 1073, 1077 (Colo. 1986). Equitable distribution is not necessarily coterminous with an equal division of assets, *In re Marriage of Simon,* 856 P.2d 47, 50 (Colo.App.1993); *In re Marriage of Gercken,* 706 P.2d 809, 810 (Colo.App.1985), and the key consideration is fairness, not

mathematical precision. *Gallo,* 752 P.2d at 55.

By holding that a trial court may not alter the third component of the "time rule" formula, the majority eliminates the trial court's traditional discretion to consider the circumstances of the case in dividing the marital assets. The impermissible effect of the majority's holding is to prevent the trial court from considering the factors statutorily mandated by section 14–10–113(1). Furthermore, such a rigid, formulaic division of benefits is in direct conflict with the long-recognized principle, discussed above, that the trial court must be granted broad discretion to achieve an equitable, rather than mathematically precise, division of property. Accordingly, I do not agree that a trial court that applies the "time rule" formula to pension benefits is required to apply the 1/2 multiplier without considering the factors set forth in section 14–10–113(1)(a)–(d).

The majority contends that the trial court implicitly takes into consideration the factors set forth in section 14–10–113(1) in evaluating its selection of a distribution method, i.e., either immediate distribution of the net present value or future distribution through application of the deferred distribution or reserve jurisdiction method. *See* maj. op. at 540.[1] Therefore, the majority concludes that use of the "time rule" formula following selection of a distribution method is not inconsistent with the trial court's duty to consider those statutory criteria. However, the majority's conclusion is not supported by a review of the factors underlying a trial court's selection of a distribution method. As the majority recognizes, the selection of a distribution method turns largely on the value of the pension benefits relative to the entire marital estate, the ability of the court to

approximate net present value, and the availability of sufficient assets in the marital estate to offset an immediate award. *See* maj. op. at 539–540. These factors focus on the ability of the marital estate to support an immediate payout to the nonemployee spouse. When selecting a distribution method, the court is not concerned with allocative factors such as the contribution of each spouse to the marital property or the other factors required for consideration before the actual division of benefits between the spouses. Evaluation of these factors must be undertaken by the trial court after the selection of a distribution method. Consequently, I do not agree that a trial court's decision to apply the "time rule" formula reflects an application of the statutory factors set forth in section 14–10–113(1)(a)–(d).

## II.

The trial court in *Hunt* divided the military pension fund benefits equally under the deferred distribution method. I conclude that this was a proper exercise of the trial court's discretion.

I disagree, however, with the majority's conclusion that the trial court in *Raimer* improperly included marital fault considerations in its analysis. Maj. op. at 542. There is an important distinction between marital misconduct, a "moral" consideration that a court is specifically prohibited from considering when dividing marital property under section 14–10–113(1), and the contribution of a spouse to the acquisition of marital property, an "economic" factor that must be considered pursuant to section 14–10–113(1)(a). *See Michaelson v. Michaelson,* 884 P.2d 695, 699–700 & n. 5 (Colo.1994) (describing the historical concept of marital fault as conduct that provided a ground for

---

1. As the majority notes, the net present value method of identifying marital property does not include increments of military pension benefits based on promotions of the employee spouse subsequent to dissolution. Maj. op. at 539. Thus, to permit the trial court to elect between the net present value method of distribution on the one hand and the deferred distribution or reserve jurisdiction methods on the other does inject an element of discretion into the classification of military pension benefits as marital or

separate property, contrary to the precept that classification of property as marital or nonmarital is a legal determination not involving the exercise of discretion. *See* Erickson, J., dissenting op. at 550. The division of military pension benefits on any basis other than reserve jurisdiction, however, necessarily involves assumptions and risks that will be tested and resolved on the basis of uncertain future events. I would accept this departure from conceptual purity as necessary to a sensible and workable scheme for division of military pension benefits.

divorce under Colorado law existing prior to adoption of the UMDA). One commentator explained the distinction as follows:

> Where fault is not a factor, the court is not permitted to consider the moral or social impact of a party's conduct during the marriage in dividing the marital estate. The court can, of course, consider *economic fault*—conduct which has a negative effect upon the parties' financial condition. Economic fault includes not only misconduct aimed directly at the parties' finances, but also the economic consequences of social or moral fault.

Turner, *Equitable Distribution of Property* § 8.09, at 600 (footnotes omitted). Our cases preceding adoption of the UDMA also reflect recognition of the distinction between these two factors. In *Liggett v. Liggett*, we stated:

> [T]he issue on the property division was not one of marital fault. It was whether the wife was entitled to a division of property by reason of having contributed to the accumulation or the preservation of the assets to be divided, and on this issue it was proper for the court to determine whether her conduct was such as to justify her sharing in a division of such property.

152 Colo. 110, 113, 380 P.2d 673, 675 (1963); *see also Kraus v. Kraus,* 159 Colo. 331, 333, 411 P.2d 240, 241–42 (1966). In accord with these authorities, I would conclude that conduct of a spouse that has a negative impact on the financial value of the marital property is properly characterized as an aspect of that party's contribution (or lack thereof) to the marital assets, and is appropriate for consideration by the trial court in dividing marital property under section 14–10–113.

The majority, however, rejects consideration of the economic effect of a party's conduct in fashioning an equitable division of the marital share of military pension benefits under the deferred distribution method. It does so for three reasons. First, it concludes that economic fault is difficult to separate from marital misconduct, that it "is a limited concept which comes into play only in extreme cases," and that *Raimer* does not present such an extreme case. Maj. op. at 542–543. Second, the majority holds that alteration of the time rule formula in a way

that fails to divide the marital share of military pension benefits equally "undermines the integrity of the formula and detracts from its very purpose," for "the formula cannot be altered." Maj. op. at 543. Finally, it rejects "discounting of the share of the non-employee spouse" because the discount "is wholly arbitrary and subjective." Maj. op. at 543. I find these reasons individually and collectively unconvincing and contrary to the standard of section 14–10–113(1)(a).

First, "economic fault" is simply a way of expressing an element of the statutorily mandated marital-property-division factor of "[t]he contribution of each spouse to the acquisition of the marital property, including the contribution of a spouse as homemaker." § 14–10–113(1)(a). For this reason, a court must consider economic fault in order to be faithful to the requirements of the statute. Although isolation of the effect of "economic fault" on the accumulation of marital property may be difficult and the result may be imprecise, it is a task statutorily required and of the type traditionally committed to the discretion of trial courts.

Second, the majority's inflexible rule that "[i]f the 'time rule' formula is used, the formula cannot be altered," maj. op. at 543, is based upon practical considerations of allocation of risks concerning future events and simplification of the trial court's task rather than upon statutory criteria. *See* maj. op. at 536–537, 543. The "time rule" formula does not take into account the contribution of each spouse towards the acquisition of the marital share of the military pension benefit. *See supra* pp. 528–529. A trial court must consider that factor to comply with the statutory requirements of § 14–10–113(1)(a).

Finally, the majority rejects departure from equal division of the marital share of military pension benefits because it is "wholly arbitrary and subjective." Maj. op. at 543. This criticism can be leveled at the division of any form of marital property. The selection of equal division as a principle by which to apportion marital property between the spouses is itself arbitrary. We have recognized, however, that application of the statutory criteria for marital property division is not a task that admits of exactitude, and

"[t]he key to an equitable distribution is fairness, not mathematical precision." *Gallo*, 752 P.2d at 55. The difficult task of expressing the relative contributions of the parties in mathematical terms is the essence of a trial court's discretionary function in dividing marital property.

In *Raimer*, the trial court's ruling, allocating forty percent of the marital share of the military pension benefit to the wife and sixty percent to the husband, reflects that the court considered the wife's lack of support for her husband's military career as evidence of her lack of contribution to the military pension fund asset. The trial court did not cast the wife's lack of support as marital misconduct, and limited her share of the pension based not only on her lack of contribution but also on her receipt of a higher portion of the non-pension marital property. Such a determination is within the trial court's broad discretion to divide the marital property in an equitable manner.[2] Accordingly, I would uphold the trial court's decision in *Raimer* to limit the wife's percentage of the marital share of her husband's pension to forty percent.

### III.

For the foregoing reasons, I concur in the majority's adoption of the first two components of the "time rule" formula for determining the marital share of military pension benefits under the deferred distribution method of dividing marital property. I dissent, however, to the majority's adoption of

the third component, which effects an equal division of the marital property portion without consideration of the factors set forth in section 14–10–113(1). I would affirm the judgment of the Colorado Court of Appeals upholding the trial court's identification and division of marital property in both *Hunt* and *Raimer*.

Justice ERICKSON dissenting:

I respectfully dissent. I do not agree with the majority's analysis of the Uniform Dissolution of Marriage Act, §§ 14–10–101 to –133, 6B C.R.S. (1987 & 1995 Supp.). In resolving division of property issues in a dissolution of marriage action, the inclusion of an asset within the marital estate is a legal determination; the manner of distribution of that asset once characterized as marital property is appropriately a matter within the trial court's discretion.

Pension rights are important economic assets within a marriage unit. *In re Marriage of Gallo*, 752 P.2d 47, 51 (Colo.1988). "[S]ince military retirement pay is awarded in return for past services, it constitutes an asset which should be divisible as marital property *to the extent the entitlement was based upon military service rendered during all or part of the marriage*." *Id.* at 52 (emphasis added) (involving retirement benefits which had vested, matured, and were being collected); *In re Marriage of Grubb*, 745 P.2d 661, 665 (Colo.1987) (involving vested retirement benefits which had not matured).[1] Narrowly framed, the question pre-

---

**2.** In particular, I cannot agree with the majority's statement and characterization that the "ten percent discount imposed by the trial court has no basis in the evidence and was selected apparently as some form of rough justice to penalize the nonemployee spouse for what the trial court viewed as her lackluster interest in one phase of her husband's military career." *See* maj. op. at 543.

**1.** This court has not determined whether unvested, unmatured pension benefits are "property" subject to division, nor does the majority address that issue. "Nonvested military retirement benefits lack the following characteristics of property: cash surrender value, loan value, redemption value, lump sum value, and a value realizable after death." *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23, 26 (1993) (holding that such benefits are not

property). *Contra Jackson v. Jackson*, 656 So.2d 875, 877 (Ala.Civ.App.1995) (cataloguing cases on both sides of the issue, but holding that an unvested military pension right "is a contractual right, subject to a contingency, and is a form of property"). *See also* 3 William M. Troyan et al., *Valuation & Distribution of Marital Property* § 46.32 (1995). Our statute requires the trial court to divide "all *property* acquired by either spouse subsequent to the marriage" with certain enumerated exceptions not applicable here. *See* § 14–10–113 (emphasis added). Although I believe the court as a whole should consider whether an unvested military pension is property, this dissent assumes, as did the majority, that unvested, unmatured military pension rights are "property" under the statute. *See Grubb*, 745 P.2d at 667–68 (Erickson, J., dissenting) (discussing vested, but unmatured military pension benefits).

sented by this consolidated review is whether increased military pension benefits due to post-dissolution rank increases are marital property.

As the majority recognizes, we have approved three methods of distribution of pensions upon dissolution: (1) net present value; (2) deferred distribution; and (3) reserve jurisdiction. Maj. op. at 530–531. *See Gallo,* 752 P.2d at 55; *Grubb,* 745 P.2d at 666. *See also* Brett R. Turner, *Equitable Distribution of Property* § 6.11 (2d ed. 1994 & 1995 Supp.). If a court reserves jurisdiction, it determines division when and if the pension vests. If the court utilizes the net present value method, the court awards the nonemployee spouse a liquidated share at dissolution. Finally, if the court elects the method of deferred distribution, it establishes a formula for division at the time of dissolution, but defers distribution until the employee spouse actually receives the benefits.

Although the trial court has broad discretion in dividing marital property, *see, e.g., In re Marriage of Nelson,* 746 P.2d 1346, 1349 (Colo.1987), the classification of property as marital or separate is a legal determination, not a matter of discretion. *See* § 14–10–113(2); *In re Marriage of Franz,* 831 P.2d 917, 918 (Colo.App.1992). By definition, marital property does not include property acquired prior to marriage or subsequent to a decree of legal separation. *See* § 14–10–113(2).

Three basic rules govern the classification of post-dissolution increases in military pension benefits:

First, retirement benefits earned as consideration for marital efforts are marital property. Second, retirement benefits earned as consideration for postmarital efforts are separate property. Third, when market or other nonmarital forces cause passive appreciation between the date of classification and the date of distribution, the appreciation is given the same classification as the underlying property. Thus, the marital share of postdivorce passive appreciation is the same as the marital share in the unappreciated asset.

Turner, *supra* § 6.10 (citations omitted).

Under these basic rules, a nonemployee spouse should not share in increased benefits due to promotions and similar individual efforts occurring after dissolution of the marriage. *See, e.g., Bishop v. Bishop,* 113 N.C.App. 725, 440 S.E.2d 591, 595–96 (1994); *Berrington v. Berrington,* 534 Pa. 393, 633 A.2d 589, 592 (1993). Although spousal support may influence an employee's final rank and position, such support presumably ceases in the event of divorce. *See In re Marriage of Olar,* 747 P.2d 676, 679–80 (Colo.1987) (distinguishing between educational degrees and vested but unmatured pensions and holding that the contribution of one spouse to the increased earning potential of the other is appropriately considered when the dissolution court divides marital property and awards maintenance). Generally, pension benefits which accrued during marriage are appropriately classified as marital property. However, increased pension benefits resulting from post-dissolution promotions are analogous to advanced educational degrees obtained during the marriage. That is, post-dissolution rank increases, although perhaps influenced by the support of the spouse during the marriage and based upon experience obtained during the marriage, depend on the post-dissolution efforts of the employee spouse. Both the employee spouse with an unvested, unmatured pension and the spouse holding an advanced degree leave the marriage with an asset which has no cash value at the time of dissolution, but may prove of value *dependent upon the spouses' individual, post-dissolution efforts.* As such, increases in pension benefits attributable to post-dissolution rank increases are appropriately classified as the separate property of the employee spouse and should not be susceptible to division by the dissolution court.

The majority concludes that "[i]f the nonemployee spouse must bear the risks attendant to waiting [under either the deferred distribution or reserve jurisdiction method], then the nonemployee should share in increased benefits that accrue during the delay." Maj. op. at 536. The majority also notes that we have held that "contingencies should be taken into account when the court disposes of marital property between the parties, not when determining which assets

belong in the marital estate." *Gallo,* 752 P.2d at 52; *Grubb,* 745 P.2d at 665. *See* maj. op. at 536. However, the majority then considers two interrelated contingencies: first, that an unvested, unmatured pension, such as those at issue here, might never vest; and, second, that, as a result, the nonemployee spouse might never get paid. Maj. op. at 536. The majority then rewards the nonemployee spouse who "risks" these contingencies by deeming increased military pension rights in such cases to be marital property. Under the holding of the majority, an increase in pension benefits attributable to post-dissolution rank increases *is* marital property when the nonemployee spouse bears a portion of the risk that the pension will not vest, as with the deferred distribution and reserve jurisdiction methods, *see In re Marriage of McGinnis,* 778 P.2d 281, 283 (Colo.App.1989), but is *not* marital property when the risk is borne entirely by the employee spouse under the net present value method.[2] Maj. op. at 539.

The trial court should consider such contingencies in selecting the methodology and distribution of the marital property, *see Nelson,* 746 P.2d at 1349; *In re Marriage of Beckman,* 800 P.2d 1376, 1379 (Colo.App. 1990), not in determining whether the benefit *is* marital property. Indeed, the trial court is statutorily required to consider the "contribution of each spouse to the acquisition of the marital property, *including the contribution of a spouse as homemaker*" when *dividing* the marital property. § 14–10–113(1)(a)

(emphasis added).[3] Thus, the nonemployee spouse who contributes to the career of the employee spouse is not without a remedy. The trial court can and should consider the nonemployee spouse's contribution when dividing marital property and awarding maintenance. *See* §§ 14–10–113(1)(a), 14–10–114. However, consideration of spousal contribution is inappropriate when determining the inclusion of the asset within the marital estate.

The majority states that separating the "marital" increase from the "separate" increase "would lead to widely divergent and inconsistent results, inject an element of fault into the property division, and enmesh the courts in the parties' lives for many years." Maj. op. at 535. On the contrary, the result espoused by the majority leads to inconsistency by placing the determination of the marital estate within the trial court's "discretion." Under the majority's approach, whether the post-dissolution pension increase constitutes marital property depends entirely upon the distribution method the trial court deems appropriate. Further, the courts are enmeshed in the parties' lives for many years under the reserve jurisdiction method, which the majority today expressly allows. Finally, even if the "time rule" set forth by the majority is the appropriate method to determine the nonemployee's participatory share in the pension increase,[4] the trial court's consideration of the nonemployee spouse's contribution or lack thereof does not inject

2. Courts have adopted three positions on the extent to which post-dissolution pension benefit increases are divisible as marital property: (1) the marital estate includes only those benefits which exist as of the date of classification; (2) the marital estate includes all benefits, regardless of when they are earned; or (3) the marital estate includes only passive increases in benefits. *See* Turner, *supra* § 6.10. The majority here appears to combine the second and third positions, concluding that the benefit increase may be *either* marital or separate property dependent upon the trial court's discretion.

3. The statute's recognition of homemaking as a "contribution" indicates that the contributions to be considered in dividing marital property are not limited to monetary contributions, but can include domestic and other types of noneconomic support.

4. If the time rule is the appropriate method, the coverture fraction should be determined by "points" rather than years. *See Beckman,* 800 P.2d at 1379.

> The military benefit is based on points which are converted into years of service. Since the basis of years of credited service is points, the coverture fraction for military benefits must be determined in terms of points rather than years, as is normally the case. Use of a simple years of service computation rather than recognition of the point system will, in some situations lead to inequitable conclusions. The greatest potential for distortion of the marital share of the benefit occurs in situations where the member of the military retirement system switches from regular component to reserve component service.

Troyan, *supra* § 46.34.

fault into the property division. *Contra* maj. op. at 535, 542–543. Rather, the trial court's consideration of the nonemployee spouse's relative contribution to the marital asset is statutorily required. *See* § 14–10–113. The majority disallows this consideration, stating: "If the 'time rule' formula is used, the formula cannot be altered." *See* maj. op. at 543. In so stating, the majority today effectively overrides the provisions of section 14–10–113 whenever the trial court uses either the deferred distribution or reserve jurisdiction methods of property division.

Accordingly, I dissent.

