25CA0187 Marriage of Franzoy 05-28-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0187
Pueblo County District Court No. 23DR136
Honorable Tayler Thomas, Judge

---

In re the Marriage of

Ginger Nicole Franzoy n/k/a Ginger Nicole Steffan,

Appellee and Cross-Appellant,

and

Trey Michael Franzoy,

Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE LUM
Welling and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 28, 2026

---

Epstein Patierno, LLP, Christina H. Patierno, Courtney J. Leathers Allen, Denver, Colorado, for Appellee and Cross-Appellant

The W Law, Jon Eric Stuebner, Carolyn Witkus, Denver, Colorado, for Appellant and Cross-Appellee

¶ 1     Trey Michael Franzoy (husband) appeals the property division portion of the district court's permanent orders entered in connection with the dissolution of his marriage to Ginger Nicole Franzoy, now known as Ginger Nicole Steffan (wife).  We affirm and remand the case to the district court to determine wife's request for appellate attorney fees under section 14-10-119, C.R.S. 2025.

## I.     Background

¶ 2     During their marriage, the parties owned and operated three business entities relevant to this appeal: Charlie Chedda's LLC (Chedda's), which had locations in Colorado Springs and Grand Junction; Patriot Contests and Games, LLC (Patriot); and Starfish Management and Consulting, LLC (Starfish).  Starfish is a holding company that owns Chedda's and Patriot.  Because Chedda's and Patriot are gaming businesses, they are often subject to governmental, legislative, and law enforcement scrutiny.

¶ 3     The district court held a three-day permanent orders hearing.  Husband testified about the risks associated with operating the businesses and expressed concern over the toll these risks had taken on him and on the business entities.  For instance, he testified that law enforcement agencies had raided Chedda's in

Colorado Springs in 2015, and in 2016, he faced personal criminal charges related to illegal gambling. Husband also testified that in 2018, Chedda's in Grand Junction began receiving threats of prosecution from the district attorney. And in 2023, Chedda's in Colorado Springs received a cease-and-desist letter. Between May 2023 and the permanent orders hearing in October 2024, law enforcement raided Chedda's in Colorado Springs location eight times. None of the raids or legal actions against any of the businesses (or against husband) had resulted in any convictions, fines, or adverse administrative actions as of the time of permanent orders.

¶ 4 Although wife was a part-owner of all three businesses, she testified about her lack of operational knowledge of how the businesses run and how the games work. Wife's role was largely confined to running errands, picking up supplies, and training employees.

¶ 5 The parties presented the court with three options for allocating the businesses:

- Award husband the businesses (wife's position);

- Order a joint sale of the businesses (husband's position); or

- Divide the businesses by awarding the Chedda's in Grand Junction to wife and all other businesses to husband (husband's alternative position).

¶ 6    The court issued thorough written permanent orders in which it valued the businesses and considered and analyzed each of the three allocation options presented by the parties. The court concluded that the most reasonable and equitable way to divide the businesses was to allocate all three to husband as his sole and separate property. In doing so, the court weighed the testimony from the parties' three experts regarding the values of each company, the nature of the specific businesses and the parties' past involvement in them, and the business risks. The court valued the business as follows:

- Chedda's — $2,847,000;

- Patriot — $976,000; and

- Starfish — $173,000.

¶ 7    To achieve an equitable division of the marital estate after allocating the rest of the property, the court ordered husband to

3

make an equalization payment to wife in the amount of $1,869,398 (amortized over ten years at a 4% interest rate). All in all, each party received marital property with a net value of $2,933,472.50.

¶ 8 After accounting for the equalization payments ordered, the court concluded that husband's gross monthly income was $78,349.25. The court imputed wife with a monthly income of $2,500. The court ordered husband to pay wife $5,000 per month in spousal maintenance for ten years.

¶ 9 Husband appeals the property division component of the permanent orders, arguing that the district court abused its discretion by allocating the three businesses to him instead of ordering a sale. (Husband doesn't argue that the court should have chosen his alternative option to divide the business entities between the parties. And neither party disputes the court's calculation of income or its maintenance award.)

II. Applicable Law & Standard of Review

¶ 10 The district court has great latitude to fashion an equitable distribution of marital property based on the unique facts and circumstances of each case. *In re Marriage of Balanson*, 25 P.3d 28, 35 (Colo. 2001); § 14-10-113(1), C.R.S. 2025. "[A]n appellate court

4

must not disturb the delicate balance achieved by the [district] court in division of property . . . unless there has been a clear abuse of discretion." *In re Marriage of Hunt*, 909 P.2d 525, 538 (Colo. 1995). A court abuses its discretion only when its decision is manifestly arbitrary, unreasonable, or unfair. *In re Marriage of Gromicko*, 2017 CO 1, ¶ 18. Credibility determinations; the weight, probative force, and sufficiency of the evidence; and the inferences and conclusions to be drawn from the evidence are matters within the district court's sole discretion. *In re Marriage of Lewis*, 66 P.3d 204, 207 (Colo. App. 2003).

## III.   Analysis

¶ 11     Husband argues that allocating the businesses solely to him while requiring him to make a substantial equalization payment to wife is inequitable and overly burdensome to him. We perceive no abuse of discretion.

### A.   The District Court's Findings

¶ 12     In valuing and allocating the businesses, the district court thoughtfully considered legal risks to the businesses, wife's involvement in business operations, the businesses' bookkeeping procedures, and the implications associated with a potential sale.

5

¶ 13    Multiple experts opined about the value of the businesses and testified about various factors that justified a reduction in value for Chedda's and Patriot due to a lack of marketability (marketability discount).  These factors included (1) a reduced buyer pool due to the legal and regulatory risks associated with gaming businesses, along with the specific software the businesses used; (2) a limited pool of buyers interested in skill-based gaming generally; (3) the likely need to find a buyer who could pay cash due to banking difficulties; and (4) earnings volatility.  The court credited this testimony and applied a 10 percent marketability discount to Chedda's and Patriot.

¶ 14    Regarding wife's involvement in the three businesses, the court made the following findings:

- It is "compelling" that wife was never on the payroll for either of the Chedda's locations and was not involved in the "complicated accounting structure of the business."

- Wife "lack[ed] operational knowledge of how the businesses are run."

- Wife "testified credibly that her role in the businesses was to run errands, pick up supplies, [and] train employees."

- Wife "does not know how the games work, nor does [she] have any idea how to fix the game machines if they ceased working."

¶ 15    The court also credited testimony from multiple experts that the businesses' financial records are "messy," particularly because the parties' personal and business expenses are significantly "intermingled."

¶ 16    Finally, the court made the following findings regarding husband's proposal to maintain the existing business ownership structure and order a sale:

- Husband's proposal for the parties to jointly sell the businesses would "intertwine[] the parties for an indefinite period of time and require[] continued contact between [h]usband and [w]ife."

- Preparing for a sale would require "immediate substantial changes in [financial] operations."

- There would likely "need to be a mechanism for oversight and possibly further court orders to supervise the sale of the" businesses.

- "Husband has significant operational knowledge that he, alone, holds in relation to this unique business"; thus, he "is the only one who is in position to negotiate with a potential buyer, and [w]ife would be totally reliant on [h]usband during the sale of the business."

B. The Court Didn't Abuse its Discretion

¶ 17 Husband argues that the court abused its discretion by allocating the businesses (and the inherent risks involved) to him when neither party wanted to keep the businesses. We disagree for four reasons.

¶ 18 First, the findings described above are supported by the record and reflect reasoned consideration of expert testimony regarding the disadvantages of ordering a sale of the businesses. The district court noted several sound reasons for declining to order a sale, including that a sale would disadvantage wife due to her lack of knowledge about the business and would leave the parties financially intertwined for an indefinite (and possibly lengthy) time.

*See In re Marriage of Paul*, 821 P.2d 925, 927 (Colo. App. 1991) (it is generally improper to continue joint ownership of a marital asset such as a continuing business operations because it is contrary to "the public policy of discouraging continued litigation and ongoing financial interaction between divorced spouses").

¶ 19   Second, the district court discredited husband's testimony that he wanted to sell the businesses because husband had continued to operate the businesses for nine years despite learning about potential criminal and civil risks as early as 2015. We can't disturb that determination. *See In re Marriage of Thornburn*, 2022 COA 80, ¶ 49 (determining witness credibility is the district court's sole province). We also note that husband gave the court an alternative proposal whereby he would continue operating some of the businesses while wife would operate another.

¶ 20   Third, to the extent that husband argues that the allocation of the risks associated with the businesses is inequitable to him, the court accounted for those risks by applying the 10 percent marketability discount to the value of the businesses. This discount rate is supported by expert testimony, and husband doesn't appeal the court's valuation.

¶ 21     Fourth, the district court noted, and we agree, that allocating the businesses to husband doesn't prevent him from selling them if he so chooses. In fact, at least one expert testified that it would be easier for husband to sell the businesses as the sole owner than it would be if he continued to co-own them with wife.

¶ 22     For these reasons, we conclude that the district court didn't abuse its discretion by allocating the businesses to husband. *See Hunt*, 909 P.2d at 538.

### IV.    Appellate Attorney Fees

¶ 23     Wife asks for her appellate attorney fees under section 14-10-119, based on the disparity in the parties' financial resources. *See In re Marriage of Gutfreund*, 148 P.3d 136, 141 (Colo. 2006) ("Section 14-10-119 empowers the [district] court to equitably apportion costs and fees between parties based on relative ability to pay.").

¶ 24     Because the district court is better situated than we are to determine the factual issues regarding parties' current financial resources, we exercise our discretion and remand wife's request to the district court. C.A.R. 39.1; *see In re Marriage of Alvis*, 2019 COA 97, ¶ 30.

10

## V.    Disposition

¶ 25    The judgment is affirmed, and the case is remanded to determine wife's section 14-10-119 appellate attorney fees request.

JUDGE WELLING and JUDGE SCHOCK concur.